[Civ. No. 18587. First Dist., Div. One. Apr. 27, 1960.]

GANIATS CONSTRUCTION, INC. (a Corporation), Appellant, v. CLARENCE HESSE et al., Respondents.

378

Nathan G. Gray for Appellant.

Cyril W. McClean, Markell C. Baer and Robert C. Burnstein for Respondents.

TOBRINER, J.—This appeal[1] originates in appellant's option to purchase real property, its consolidated suits for a declaratory judgment and specific performance, and a decree adverse to appellant. Appellant directs its primary attack against the court's conclusion that the option agreement violates the statute of frauds. Appellant secondarily challenges the trial judge's sustention of various equitable defenses to specific performance, including an alleged harsh contract, unclean hands, and inadequate consideration, as well as his denial of damages to appellant. Since we believe that the trial court's judgment should be affirmed because the statute of frauds invalidated the option, we need not discuss the issues relating to the various equitable defenses to specific performance.

The negotiations of the parties in this case ultimately resulted in the disputed options extended by respondent to appellant. In the latter part of 1950 agents of appellant, a

---

[1] Elizabeth Hesse, Clarence Hesse's wife, was named as a defendant in appellant's suit for declaratory judgment; her cross-complaint was dismissed pursuant to a stipulated agreement that if appellant obtained an interest in any of the property she would receive $10,000 from appellant. However, she still remains a party defendant and respondent, but since her attorney has filed a letter adopting by reference the briefs of Clarence Hesse our designation of ''respondent,'' though including Elizabeth, refers to Clarence unless the context indicates otherwise.

corporation engaged in the development and sale of subdivision tracts, sought to purchase respondent's farm of approximately 230 acres for $1,200 per acre. Respondent refused this offer. Negotiations between the parties finally culminated in respondent's granting appellant an option for which appellant paid "no consideration whatsoever" and which "instrument was never recorded." After preparation by respondent's then attorney, Mr. Haley, and discussion by the parties in his office, respondent signed the option agreement on January 11, 1951. The agreement describes two parcels of land by metes and bounds and then provides for certain options which in the aggregate comprise all of the described land.[2]

On July 3, 1951, although, at this date, appellant's option had expired, respondent conveyed to appellant 10 acres in an irregular shape, which fronted on Hesperian Boulevard. On August 29, 1952, in consideration of 35 monthly payments of $191.25 by appellant, respondent extended until 12 noon of August 1, 1955, the time within which appellant could exercise the option to the "next contiguous thirty (30) acres." Contingent upon the exercise of appellant's option to the first 30 acres and the completion of all the required monthly payments, the agreement extended respectively the time for purchasing the next contiguous 70 acres, and, thereafter, the next contiguous 120 acres, until 12 noon of August 1, 1956, and 12 noon of August 1, 1957. Although by October of 1954 respondent had decided not to perform under this modified

---

[2] "PURCHASE PRICE: The above described real property consists of approximately two hundred thirty (230) acres, more or less, and the purchase price for said land, commencing on . . . Hesperian Boulevard . . . and proceeding in an easterly direction, is as follows: (a) . . . $1,800.00 . . . per acre for the first forty (40) acres; (b) . . . $1,500.00 . . . per acre for the next contiguous seventy (70) acres; (c) . . . $1,400.00 . . . per acre for the next one hundred twenty (120) contiguous acres; more or less, being the balance of the above described real property exclusive of said homesite.

"TIMES FOR EXERCISE OF OPTION: Buyer must exercise option to purchase said real property in parcels of not less than the acreages hereinafter set forth and each purchase shall be of successive contiguous acres, commencing with ten (10) acres fronting on . . . Hesperian Boulevard. . . . The successive options to purchase must be exercised within the following periods of time: (a) The first ten (10) acres fronting on . . . Hesperian Boulevard . . . on or before 12:00 o'clock noon June 1, 1951; . . . (c) The next contiguous seventy (70) acres on or before 12:00 noon August 1, 1953; (d) The next contiguous one hundred twenty (120) acres, more or less, being the remainder of said property, exclusive of said homesite, on or before 12:00 noon August 1, 1954."

agreement of August 29, 1952, he continued to accept appellant's monthly payments until June of 1955.

On April 19, 1955, appellant notified respondent that it was exercising its option to purchase the 30-acre tract, and, within the time required by the agreement, appellant deposited the purchase price in escrow. Appellant thereafter, on April 22, 1955, furnished respondent with two different descriptions, both purportedly embracing the 30 acres, and sought to obtain respondent's consent to either description. Respondent refused to execute a deed to the 30 acres.

On April 20, 1955, appellant filed an action to quiet title to its claimed option rights; on April 28, 1955, it brought a separate suit for specific performance to compel respondent to convey 30 acres or for damages in the alternative. Later appellant amended this complaint, incorporating a somewhat different description of the property than those given respondent on April 22, still only seeking specific performance of the 30-acre option. On September 14, 1955, appellant amended its quiet title complaint to obtain a declaration of its rights in all of respondent's property described in the original and supplementary option agreements. These actions were consolidated for trial. On January 13, 1956, appellant notified respondent that it was exercising its option to all of respondent's property and deposited $240,000 in escrow to cover the transaction. Respondent rejected appellant's claim and the case proceeded to trial on September 6, 1956.

Although appellant presented its case on the theory that the option agreements were unambiguous, it introduced, as plaintiff in the consolidated actions, the testimony of Mr. Riffe, a registered civil engineer, who, over respondent's objection, described the "next contiguous 30 acres" to be contained within a metes and bounds description identical to those set out in the appellant's amended complaint. In support of this description, Riffe said that as a civil engineer he knew of no other lines which could encompass the next contiguous 30 acres; that "next contiguous" in relation to preparing descriptions had a "particular significance to an engineer or surveyor."

Subsequently, appellant's attorney, in offering an alternate description of the 30-acre parcel, which differed from the other description in that the eastern boundary paralleled the western boundary, stated, "Our theory of the case is this, Your Honor; that literally speaking 'next contiguous' is as

stated by the witness as shown here thus far. However, under the cases that I have cited . . . if the Court does not feel that that is the proper description, we take the position that . . . the Court fixes the line parallel to the westerly line, and I'm offering that as an alternative theory. . . ." In addition to these two descriptions of the 30-acre tract, appellant introduced its attorney's letter to Hesse's attorney, in which appellant, seeking to exercise its option, referred to two descriptions, one of which was different than either of the above two descriptions. Thus, appellant presented to the trial court three different descriptions of the 30-acre parcel.

Respondent's witness, Mr. Mancini, a registered civil engineer, stated that the words "next contiguous" do not have any engineering significance whatsoever; that these words would be of no assistance in ascertaining the metes and bounds of the next contiguous 30 acres and that with this description he could lay out "any number of parcels containing that acreage, an infinite number of parcels."

Another civil engineer, Mr. Mattson, a witness for respondent, testified that from an engineering standpoint a request to lay out the "next contiguous thirty acres" to the 10 previously conveyed to appellant would be insufficient to enable him to comply with the request.

Mr. Haley who, as we have noted, was respondent's attorney in the preparation of the option, stated on behalf of respondent that at the time of the signing of the supplemental option agreement he told Alexander Ganiats that "it would be far more satisfactory that a more positive metes and bounds description be made of the successive parcels to be taken under the Option." To this Ganiats replied that "in the development of the piece of property of this nature . . . it would . . . ultimately be taken as the successive options were exercised because the actual boundaries would be dependent upon the final map of the several units they proposed to subdivide." Haley also stated, over appellant's parol evidence objection, that during the negotiation of the lease, which respondent granted appellant for a corporation yard, Ganiats told respondent, "You know, Clarence, if we wanted to, we could take a 10-acre strip clear through from the front to the back, a very narrow strip of land."

Mr. Alexander Ganiats, manager and secretary-treasurer of appellant corporation, testified that on approximately July 3, 1951, he went to see respondent as to the 10-acre

parcel and that he "told Mr. Hesse that we were going to exercise [the option to] the first 10 acres and asked him where the boundary, the eastern boundary line in his mind should be fixed, and he told me that he would like the line at right angles to the . . . northern boundary line. He scratched it on the ground and finally I saw what he wanted and I then got a map from my car, a title policy, and marked it on the title policy. . . . I asked him about the eastern line of the 30-acre parcel, . . . and he, at the time . . . scratched this on the ground, . . . he showed me that he wanted the lines, as he put it, even, and finally I pinned him down that he wanted the two lines parallel to the east for farming."

The court entered a finding that the "option contract does not contain any enforceable description of the thirty acre area to be conveyed after the first ten acres . . . which is sufficient or definite enough to enable a Court to determine the identity or description of the areas in question . . . or to sustain such a contract, as the parties agreed only on the quantity to be involved in each of the succeeding parcels and that they should be contiguous to previous parcels conveyed and then left the final identity to future determination."

As to the attempt of appellant on January 13, 1956, to exercise the option to all of respondent's property and its deposit of $240,000 to cover the price, the trial court found, "[t]hat said option agreement by its own terms expired on August 1, 1955," since appellant did not attempt to exercise its option as to the entire property of respondent until January 13, 1956.

The court rendered conclusions of law that the option agreement contains no adequate description of the parcels to be sold by respondent nor any key thereto whereby the court could determine the locations of said parcels; that the parties intended the descriptions to be indefinite; and therefore the agreement is wholly void and insufficient as a contract at law for the conveyance of real property or for any other purpose; that the parties intended to leave for future negotiations the ascertainment of the land to be taken.

Except as to the 10 acres purchased by appellant prior to these actions, the court entered judgment decreeing the options null and void and declaring that appellant has no interest in any property described therein.

We must determine whether the description in the instrument is sufficiently definite to meet the test established under the statute of frauds. An option to purchase real

property falls within that statute as "[a]n agreement . . . for the sale of real property. . . ." (Civ. Code, § 1624, subd. 4; Code Civ. Proc., § 1973, subd. 4; *Bovo* v. *Abrahamson* (1929), 100 Cal.App. 373, 382-383 [280 P. 191]; *Wilson* v. *Bailey* (1937), 8 Cal.2d 416, 421-422 [65 P.2d 770]; *Pacific etc. Dev. Corp.* v. *Western Pac. R.R. Co.* (1956), 47 Cal.2d 62, 66 [301 P.2d 825].) ▉ An option for the purchase of realty must, therefore, contain "such a description of the property . . . , either in terms or by reference, that it can be ascertained without resort to parol evidence. ▉ Parol evidence may be resorted to for the purpose of identifying the description contained in the writing with its location upon the ground, but not for the purpose of ascertaining and locating the land about which the parties negotiated and supplying a description thereof which they have omitted from the writing." (*Craig* v. *Zelian* (1902), 137 Cal. 105-106 [69 P. 853].) ▉ From this requirement there evolves the test for determining the sufficiency of the description: can a surveyor with the written instrument before him and with or without the admissible parol evidence locate the land and establish its boundaries? (*Hink* v. *Bowlsby* (1953), 199 Ore. 238 [260 P.2d 1091, 1093-1094]; *Blume* v. *MacGregor* (1944), 64 Cal. App.2d 244, 251-252 [148 P.2d 656].) The meaning of the phrase "the next contiguous thirty acres" consequently becomes the pivotal point of the instant appeal.

The reference to the acreage in the designation "the next contiguous thirty acres" is not in itself a self-sufficient description. ▉ An acre is "[a] quantity of land containing 160 square rods of land, in whatever shape." (Black's Law Dictionary (4th ed., 1951), p. 42.) An acre can be a circular, square, triangular, irregular, broad or narrow strip of land. Indeed, an acre is not a concrete form; it is a term of quantity and it can be applied to land in all manner of patterns.

▉ As we shall point out *infra* in more detail, the crucial term "next contiguous thirty acres" does not in itself specify the area covered by the option. In the first place the contiguity of *one acre* "next" to the westerly boundary would literally suffice to fulfill the definition, leaving open and unspecified the location of the remaining acreage. Even if we place all the 30 acres as close to the westerly boundary as possible: that is, the maximum number of acres adjacent to the westerly line, the remaining acres of the area may still take various forms or shapes, and the location of the easterly

boundary remains indefinite. Indeed the ambiguity of the description as to the easterly line is apparently confirmed by appellant's offer of three alternative descriptions. Finally substantial parol testimony of the engineers disclosed that the description was meaningless as a guide to the identification of the property. In view of these manifestations of ambiguity we cannot hold the court erred in holding the option unenforceable. Nor, then, did it err in admitting parol testimony as to the contemporaneous construction of the instrument in order to give meaning to its terms and to ascertain the intent of the parties in the use of such terms. Substantial parol testimony, in turn, showed that the parties themselves intentionally left the description sufficiently loose to permit a future selection of the acreage.

We turn to a more complete analysis of each of these issues.

1. *The contiguity of one acre would fulfill the description.*

The fact that "contiguous" realty need have only a minimum common boundary with the adjacent property is exemplified by *City of Burlingame* v. *County of San Mateo* (1949), 90 Cal.App.2d 705 [203 P.2d 807]. In that case, the court, upholding the annexation by Burlingame of a horseshoe strip of land 100 feet wide and 14,950 feet long, rejected "[r]espondent's . . . contention . . . that the annexed territory is not contiguous to Burlingame for the reason that the strip is a mere 100 feet wide . . . [and] encloses an unincorporated area of 730 acres. . . ." (P. 709.) Justice Dooling stated that "[c]ontiguity does not depend on the extent of the property annexed. . . ." (P. 709.) "The only limitation imposed by the statute in our case is that the annexed property must be contiguous to Burlingame. The 'horseshoe strip' . . . is contiguous to, i.e., has a common boundary with, Burlingame for an aggregate distance of 200 feet. . . ." (P. 710.) See also *Rafferty* v. *City of Covina* (1955), 133 Cal.App.2d 745 [285 P.2d 94], in which case the court held the Proposed Westerly Annexation District Number 18, an irregularly shaped district, to be "contiguous" to the city of Covina.

As stated by the American Law Reports annotator, "[T]he general rule is that land cannot be annexed to a city or town unless it is contiguous thereto, [but] it is not necessary that each and every tract of land sought to be annexed shall be contiguous to the municipality. If all of the tracts are contiguous to each other, and one of them is contiguous to or

adjoins the city, that is sufficient. *Evansville* v. *Page* (1864), 23 Ind. 525; *Catterlin* v. *Frankfort* (1882), 87 Ind. 45; *Huff* v. *Lafayette* (1886), 108 Ind. 14 [8 N.E. 701]; *Hurla* v. *Kansas City* (1891), 46 Kan. 738 [27 P. 143]; *Re Camp Hill* (1891), 142 Pa. 511 [21 A. 978]. See also *People* ex rel. *Sackmann* v. *Keechler* (1901), 194 Ill. 235 [62 N.E. 525].'' (62 A.L.R. 1016.)

Thus, the only definite denominator in the 30-acre description is the requirement that at least 1 acre must have a common boundary with the 10 acres previously purchased by the appellant. Nor does use of the word ''next'' in ''next contiguous'' affect the requirement for a common boundary only; the use of the word is redundant; as an adverb it means ''[i]n the time, place, or order nearest or immediately succeeding. . . .'' (Webster's New International Dictionary, 2nd ed., unabridged, 1940, at p. 1649.)

2. *Even if the 30 acres are placed as close as possible to the westerly line, the requirement of ''next'' contiguity does not exclude arrangements of the acreage other than appellant's proposed layout and does not fix the easterly line.*

▮ Although appellant argues ''the westerly, northerly, and southerly boundaries of the 'next contiguous thirty (30) acres' are fixed, and only the easterly line is required to encompass the parcel,'' the northerly and southerly boundaries can be regarded as ''fixed'' only if we assume the acres are to fill in the area *between* the northerly and southerly boundaries. Could not the 30 acres still be contiguous if they were stretched ''contiguously'' along the northerly boundary? Or the southerly boundary? Or in any conceivable number of shapes, so long as one boundary touched the boundary of the ''first ten acres''? Even assuming we can satisfactorily answer these questions, where do we place the easterly line?

3. *Appellant's submission of three alternative designations of the easterly line disproves the certainty of the description.*

▮ Appellant's three proffered descriptions of the land are incompatible with its claimed certainty of one. Certainty is not manifested by interpretations in triplicate. Appellant's letter of April 22, 1955 (Plaintiff's Exhibit No. 14 in Evidence) encloses ''two descriptions''; one ''has the easterly boundary at right angles with the northerly boundary, whereas the other description . . . has the easterly boundary parallel with the westerly boundary.'' Despite appellant's insistence that the variation is ''slight,'' it still calls for reso-

lution, and this requirement destroys the argued indisputability of the description. Moreover, appellant submitted a third description. Appellant's engineer, Riffe, defined the eastern boundary to consist of an arc or curve. According to appellant, it adopted this " 'literal' interpretation of the language" after "defendant repudiated the agreement," and then inserted this description in paragraph XII(b) of its "Amendment to Complaint." Appellant states, " [T]hese cases were tried on the theory that the court would *select* the description legally applicable. . . ." (Italics added.) Selectivity presupposes the very latitude which appellant must contend does not exist.

Appellant's contention that we must as a matter of law reverse the trial court because it did not resolve the uncertainty must fail. The court found, and concluded, that the option agreement was "not complete, certain or final as to its material terms." (Conclusions of Law, 11.) Appellant's own submission to the court of the resolution of the undetermined boundary substantiates the conclusion. The instrument in itself could not contain, in the face of appellant's own doubt, the necessary certainty.

Appellant contends that the decisions hold that the fact that it furnished "alternative descriptions or . . . labored under a mistaken belief in suggesting any of these descriptions" does not preclude its "right to . . . relief." But the cited *Dreyer* v. *Cole* (1930), 210 Cal. 339 [292 P. 123], holds only that a variance between the description of one boundary in the complaint and the court's findings is "immaterial, if, in fact, there is any evidence to support the finding of the trial court." (P. 340.) In the instant case the trial court was *unable* to ascertain the disputed area and found, not a fixed easterly boundary, but an uncertain, incomplete agreement.

Appellant cites *Wright* v. *L. W. Wilson Co., Inc.* (1931), 212 Cal. 569 [299 P. 521], to support the contention that its submission of two of the possible lines could properly rest upon "conversations had by Ganiats with the defendant at the time the option of the 10-acre parcel was exercised." The case illustrates the principle that parol evidence is admissible to identify, more particularly, property which had been defined with certainty in escrow instructions; it does not hold that parol conversations may supply the description. In any event the case does not explain or justify appellant's third

description. In *Sequoia Investment Corp.* v. *Paillard* (1955), 135 Cal.App.2d 166 [286 P.2d 857], Justice White, while alluding to the fact that "respondent had no misgivings regarding the property to be sold" (p. 170), did not hold the boundaries could be fixed by such an expression; parol evidence could be introduced for "identification," not for "ascertaining and locating" the disputed property (p. 171). None of these cases fill the void of appellant's admitted inability to designate one complete and certain description of this property.

Appellant's cases of *Morgan* v. *Stearns* (1871), 40 Cal. 434, 438; *Chatfield* v. *Williams* (1890), 85 Cal. 518, 521 [24 P. 839]; and *Porter* v. *Arnold* (1955), 136 Cal.App.2d 636, 638 [289 P.2d 47], do not explain away appellant's multiple descriptions. The cases merely hold that a purchaser of real property bears no duty to prepare a deed; such is the obligation of the vendor. The latter two cases also held that even though the purchaser does prepare and propose an erroneous deed that error does not excuse the vendor from performance.

4. *The parol testimony disclosed the uncertainty of the description.*

▆▆▆ The court admitted parol testimony in order that the engineers could locate or identify the property. Substantial testimony, however, indicated that such identification was impossible. The court admitted additional testimony to the effect that the parties purposely made use of a description that was inherently ambiguous. Appellant objects to the introduction of this latter testimony, claiming that parol testimony cannot be admitted to support an interpretation of a contract that conflicts with its written word or that defeats the intention of the parties to it, citing such cases as *Bouchard* v. *Cole* (1956), 143 Cal.App.2d 93, 98 [299 P.2d 697], and *Achen* v. *Pepsi-Cola Bottling Co.* (1951), 105 Cal. App.2d 113, 123 [233 P.2d 74]. But, as we shall point out, the purpose of the testimony here was not to defeat the meaning of the words of the parties but to give them content. The testimony showed that, as employed by them, the words designated no certain tract but embraced the parties' future selection of the land.

The court's admission of the testimony may be sustained both because of the light the testimony throws upon the terms of the description and because appellant itself opened up the matter for the introduction of parol testimony.

The first justification finds support in *Beneficial etc. Ins. Co.* v. *Kurt Hitke & Co.* (1956), 46 Cal.2d 517, 524 [297 P.2d 428]. The Supreme Court quotes from *California Emp. Stab. Com.* v. *Walters* (1944), 64 Cal.App.2d 554 [149 P.2d 17], to the effect that "[t]*he very fact, however, that plaintiff questioned the meaning of certain words and clauses used in framing the agreement in itself shows that it was ambiguous.*" Justice Bray, speaking for this court in *United Truckmen, Inc.* v. *Lorentz* (1952), 114 Cal.App.2d 26, 29 [249 P.2d 352], states, "Assuming, however, that the agreement is ambiguous, we can see no reason why parol evidence should not be admitted (if it exists) to explain what the parties meant by the terms '*about* 275 feet,' '*approximately* 500 feet *deep*,' and '*about* 3 acres.'" The court points out that the parol testimony could clarify the terms and make the description definite and certain: "On the other hand, if something else was intended which makes an indefinite or uncertain description, then the court would have to so find." (P. 29.) To the same effect: *Mayers* v. *Loew's, Inc.* (1950), 35 Cal.2d 822, 829 [221 P.2d 26]; *Wells* v. *Wells* (1946), 74 Cal.App.2d 449 [169 P.2d 23]; *Barham* v. *Barham* (1949), 33 Cal.2d 416 [202 P.2d 289].

Relying upon the above rule, the court admitted the testimony of Marlin Haley to the effect that the parties purposely left ambiguous the description of the successive tracts. Moreover, despite appellant's contention that the trial court relied exclusively upon this testimony in finding the contract indefinite, such testimony actually was cumulative. Other and additional evidence disclosed such factors as the uncertainty of the future approval of the subdivision plans by the public authorities, the difficulty of the parties in prescribing precise areas for the subdivision or for rights of way, and other deficiencies in the identification of the area.

As to the second point, appellant's own witness, Riffe, having stated that the only possible description that could cover the described 30 acres would necessarily be that which he had diagrammed, then proceeded to contend that the words "next contiguous" connoted a different meaning to an engineer than to a layman. Respondent could properly challenge that characterization of the language, if for no other reason than to introduce testimony that an engineer would be unable to plot the area and that the words were uncertain and indefinite. This conclusion finds support in *Estate of Visaxis,*

95 Cal.App. 617, 624-625 [273 P. 165], ''Where one introduces evidence of certain facts he waives the right to object to the offer of evidence of the same facts by his opponent. . . .'' To avoid this case appellant says its ''witnesses were not asked to interpret the contract but to merely compute the location of the boundary line. . . .'' While it is true that respondent's witnesses testified to the lack of meaning of the words in the contract, the argument fails in the face of Riffe's explanation of the engineering approach which served as the basis of his direct testimony.

5. *Appellant's cases do not support its position that the option described with certainty the boundaries of the parcel.*

■■■■ ·Appellant's cases fail to sustain its contention that the quantity of land contained in the successive option parcels gave certainty to the boundaries of the 30-acre parcel; the cited cases involve descriptions more complete than the instant instrument.

The quantity of acreage may, of course, as the court said in *Matteson* v. *McCarty* (1929), 98 Cal.App. 45, 49 [276 P. 414], shed valuable light upon the issue but it cannot exclusively resolve it. The court in that case determined that in fixing the boundary as between the northerly bank of the Tuolumne River and a subsequent description based upon the meander lines, it ''seems clear that the grantor, in so designating the questioned boundary and in changing the acreage from substantially ninety-nine acres to ninety-two acres, manifested a definite intention to use the meander line as the boundary for the tract conveyed.'' (P. 48.) The court relied on the acreage designation only to fix the proper line as between two possible but designated boundaries.

Similarly *Hostetter* v. *Los Angeles Terminal Ry. Co.* (1895), 108 Cal. 38 [41 P. 330], involved the interpretation of two deeds which fixed the boundary lines and distances of all but one side of the area; as to the remaining, connecting line, one party argued that it followed a river and the other, that it was a straight line. The line of the stream corresponded with the distance and acreage given in the deed. In affirming the trial court's designation of that line the Supreme Court pointed out that the ''statement of the acreage . . . often serves as the acting, moving cause for the conclusion reached.'' (P. 42.)

Thus in *Hicks* v. *Coleman* (1864), 25 Cal. 122 [85 Am.Dec. 103], the court said: ''The construction we have put upon the

*calls* of the deed is the only one that harmonizes the quantity called for with the *extent and direction of the lines,* and in our judgment is the only reasonable construction the language will bear." (P. 144; italics added.) *Winans* v. *Cheney* (1880), 55 Cal. 567, 569, also involved a reconciliation of a boundary line with an acreage description.

The cited cases of *Blume* v. *MacGregor, supra* (1944), 64 Cal.App.2d 244; *Denbo* v. *Senness* (1953), 120 Cal.App.2d 863 [262 P.2d 31]; and *United Truckmen, Inc.* v. *Lorentz, supra* (1952), 114 Cal.App.2d 26, all contained more than a mere reference to the acreage. In the first mentioned case, the deed expressed (a) the purpose for which it was given, a railroad right of way, (b) numerous metes and bounds descriptions, and (c) the acreage; these factors afforded the basis for the court's interpolation of some missing directions and distances, which, when included, made the strip of land a uniform width of 40 feet. In the latter two cases the description supplied descriptions of two sides of the property involved. Similarly in *McKevitt* v. *City of Sacramento* (1921), 55 Cal.App. 117 [203 P. 132], the "description of the land . . . gave three boundaries and the aggregate acreage of the land." The court then noted that "[t]he property might be readily identified by a competent surveyor, with reasonable certainty." (P. 127.)

Finally, *Hall* v. *Shotwell* (1885), 66 Cal. 379 [5 P. 683], passes upon a deed which prescribed the acreage "to be in a square form." (P. 380.) The court held: "The description of the particular tract is sufficient for location. By the terms of the description, form and quantity are expressed, i.e., 200 acres in a square form; the bay of San Francisco is designated as one of the sides of the square, i.e., the westerly side, and the Embarcadero creek as another side, i.e., the northerly side —each being at right angles with each other; the Embarcadero on the bay of San Francisco being the point of connection between them." (P. 381.)

Appellant's contention that the decisions support its so-called parallel lines doctrine and that this court can draw the eastern boundary of the 30 acres parallel with that of the eastern boundary of the 10 acre tract assumes: (1) that the 30 acres must be contiguous along the entire eastern boundary of the 10-acre tract; and (2) that the sides of the 234-acre metes and bounds description are also the sides of the 30-acre parcel. As has previously been indicated these assumptions are not necessarily contained in the requirement of

contiguity. Nor does the doctrine of parallel lines accord with the two other descriptions offered by appellant.

The cases which appellant cites to support its position actually establish that the court's purpose must be to find the intent of the parties and if that intent envisaged a parallelogram to execute it by drawing parallel lines. Thus in *California Real Estate Co.* v. *Walkup* (1915), 27 Cal.App. 441 [150 P. 385], the description in the deed read: " 'The north 1878 feet of the west 1852 feet of section 9, township 11 north, range 5 east, situated in the county of Placer, state of California.' " (P. 448.) The court held that "there would seem to be no difficulty in identifying said land. The north 1878 feet of the west 1852 feet of section 9 obviously covers a strip of land in the northwest corner of said section 1878 feet long on its east and west boundary lines and 1852 feet long on its north and south boundary lines. The west 1852 feet of the section can only mean a strip of land of a uniform width extending along the whole west side of the section and the north 1878 feet of such strip is the portion of said strip between the northerly line of the section and a line drawn parallel thereto and 1878 feet south thereof." (P. 448.) In the cited case we have the specific lengths of the sides of a parallelogram; in the instant case, unless we adopt appellant's assumption, we have an area without boundaries.

A similar case, *Hicks* v. *Coleman, supra* (1864), 25 Cal. 122, involved the interpretation of a deed "the boundaries of which are as follows: On the north or northwest the Cosumnes River; on the east or northeast by a line that starts from a point on the Cosumnes River called Paso Viejo . . . and runs in a line *directly crossing* the line of the river above referred to; on the south or southeast by a line that runs one league or five thousand varas parallel with the Cosumnes River; on the east or southeast by a line that runs one league . . . parallel with the line on the east or northeast." (P. 124; italics added.) Since the deed called for one league, the court reduced the line following the meanderings of the stream to a straight line and then construed "directly crossing" as meaning at right angles. The establishment of the rectangular line thus followed from the language of the deed.

Appellant cites us the favorable quotation in Hicks from *Craig* v. *Hawkins' Heirs* (1 Bibb (Ky.) 54) but Hicks in reality turns upon the language of the deed there involved, and the inclusion of the Craig quotation is dicta. We therefore conclude that neither the theory nor the cases suggested

by appellant to support its doctrine of parallel lines, a third and apparently lately adopted theory, dispels the ambiguity of the option.

We conclude that in view of the many possible interpretations of the description, as illustrated by analogous cases, we cannot reverse the trial court upon the ground that, as a matter of law, the language depicted a single, certain and definable area. There are many possibilities for plotting the 30 contiguous acres, and we cannot hold the trial court erred in not fixing upon one. Appellant's suggestion of three possible easterly boundary lines confirms the uncertainty. We cannot rule the admission of parol testimony erroneous, and it, in turn, gave substantial proof that the parties intentionally left the description loose.

Since the option agreement thus fails under the statute of frauds, it cannot support an award of damages. (*Blank* v. *Rodgers* (1927), 82 Cal.App. 35, 42 [255 P. 235].) The disposition of the option agreement renders unnecessary a resolution of the other issues raised.

Since the judgment requires respondent to return the total amount of the monthly payments paid by appellant pursuant to the extension of the agreement of August 29, 1952, no unjust enrichment accrues to respondent.

We affirm the judgment.

Bray, P. J., and Duniway, J., concurred.

A petition for a rehearing was denied May 25, 1960, and appellant's petition for a hearing by the Supreme Court was denied June 22, 1960. Schauer, J., was of the opinion that the petition should be granted.