[No. A099429. First Dist., Div. Five. Nov. 4, 2003.]

ALAMEDA BELT LINE, Plaintiff and Respondent, v.
THE CITY OF ALAMEDA, Defendant and Appellant.

## COUNSEL

Carol A. Korade, City Attorney; Dang and Trachuk and Douglas Y. Dang for Defendant and Appellant..

Hill, Farrer & Burrill, Benjamin B. Salvaty, Dean E. Dennis, William M. Bitting and Robert P. Silverstein for Plaintiff and Respondent.

## OPINION

**STEVENS, J.**—Appellant the City of Alameda contends the trial court improperly held on summary judgment that a repurchase option in a written contract was not sufficiently definite to be enforceable under the statute of frauds. This appeal raises an issue as to whether extrinsic or parol evidence coming into existence *after* the execution of a written agreement may be considered in order to satisfy the statute of frauds, and render the agreement sufficiently certain to be enforceable. We conclude such evidence may be considered, and we therefore vacate the trial court's orders, and remand for further proceedings.

## I. FACTS AND PROCEDURAL HISTORY

In 1918, the City of Alameda (City) constructed a municipal belt line railroad along Clement Avenue, between Pearl and Grand Street, to serve the newly developing northern industrial area of the City. Six years later, the City council formed a committee to investigate and make recommendations for extending the belt line to serve a large scale project involving California Packing Corporation and Alaska Packers Association, as well as other future industrial development. The committee recommended a separate belt line company be formed to take over the existing municipal railway, and to immediately extend it westerly to Webster Street, and further west as industry expanded.

On September 16, 1924, the City enacted ordinance No. 259 N.S. (new series), setting forth an agreement to sell the railroad to the Western Pacific

Railroad Company and The Atchison, Topeka and Sante Fe Railway Company, provided the two railway companies organized a corporation known as the Alameda Belt Line (hereafter ABL) for the purposes of owning and operating the municipal belt line railroad.

The parties formally executed the agreement on December 15, 1924, whereby the City agreed to sell the railroad to ABL for the sum of $30,000. Paragraph 14 of the agreement, which is at issue here, gave the City an option to repurchase the belt line railroad. It provided: "Said City shall have the right at any time hereafter to purchase said belt line railroad including all extensions thereof, for a sum equal to the original cost, together with the cost of any and all additional investments and extensions made therein by said ALAMEDA BELT LINE, provided, that said City shall give at least one year's previous notice of its intention so to do by ordinance to that effect; and provided that at the same time it purchases from the parties of the first part, or either of them as the case may be, the branch railroad, extensions and spur tracks referred to in the twelfth section hereof. [¶] It is agreed that said ALAMEDA BELT LINE will keep an accurate account of the cost of additional investments and extensions, and file a verified report thereof annually with the City Clerk of said City, similar to the report filed with the Railroad Commission. It is further agreed and understood that the term 'investments' as herein used shall not include the cost of upkeep and repairs."

On October 6, 1999, the City staff filed a report with the Mayor of Alameda informing him that ABL had been cutting back operations and selling off parcels of its property. The report made specific reference to a 22-acre rail storage yard that ABL was in the process of selling for about $18 million. The staff believed the fair market value of this property alone was significantly more then the original $30,000 that ABL paid the City for the railroad, plus the cost of all investments and extensions they made subsequent to the original purchase. Based on the staff recommendation, the Alameda City Council passed ordinance No. 2817 N.S. on November 2, 1999, giving notice to ABL that the City intended to exercise its option to repurchase the railroad and all extensions thereof on December 4, 2000, pursuant to the requirements of paragraph 14 of the parties' 1924 agreement.

ABL responded to the 1999 ordinance by filing this lawsuit for injunctive relief, declaratory relief, and inverse condemnation. The City filed an amended cross-complaint, seeking a declaration that paragraph 14 gave the City a valid present contractual right to repurchase the railroad and all of its extensions.

In January 2002, both ABL and the City filed cross-motions for summary adjudication as to their causes of action for declaratory relief. ABL sought a declaration that paragraph 14 was unenforceable on the grounds that the option lacked sufficient specificity to comply with the statute of frauds, and that the fixed price option would be an illegal restraint on alienation. On the other hand, the City sought a declaration that paragraph 14 was enforceable.

On April 11, 2002, the trial court issued orders granting ABL's motion and denying the City's motion on the same grounds. The court ruled as a matter of law that the repurchase option in paragraph 14 was not sufficiently definite to be enforceable under the statute of frauds. After judgment was entered, the City filed this appeal.

## II. *DISCUSSION*

### A. *STANDARD OF REVIEW*

In reviewing an order granting summary judgment, we conduct an independent review to determine whether there are triable issues of material fact, and whether the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c); *Ochoa v. Pacific Gas & Electric Co.* (1998) 61 Cal.App.4th 1480, 1485 [72 Cal.Rptr.2d 232].) We must construe the moving party's evidence strictly, and the nonmoving party's evidence liberally, in determining whether triable issues are present. (See *D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, 20 [112 Cal.Rptr. 786, 520 P.2d 10]; *Lee v. Electric Motor Division* (1985) 169 Cal.App.3d 375, 382 [215 Cal.Rptr. 195].)

### B. *THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT BASED ON THE STATUTE OF FRAUDS.*

The trial court ruled on summary judgment that the option to repurchase in the parties' written contract was not sufficiently certain to survive the requirements of the statute of frauds. In addressing this legal ruling, we must first review relevant legal principles related to the statute of frauds, and general rules regarding the admission of parol or extrinsic evidence in interpretation of written contracts. Then, we must determine whether parol or extrinsic evidence coming into existence after the execution of an agreement may be considered, to make the contract terms sufficiently certain for enforcement.

#### 1. *The Statute of Frauds and Parol Evidence*

The statute of frauds requires contracts and options for the sale of real property to be in writing. (Civ. Code, § 1624.) "To satisfy the statute of

frauds, the memorandum affecting the sale of real property must so describe the land that it can be identified with reasonable certainty." (*Beverage v. Canton Placer Mining Co.* (1955) 43 Cal.2d 769, 774 [278 P.2d 694] (*Beverage*).) If one party to the contract is a municipality, as is the case here, an ordinance may also be construed as a memorandum. (*American-Hawaiian Steamship Co. v. Home Sav. and Loan Assn.* (1974) 38 Cal.App.3d 73, 80 [112 Cal.Rptr. 897].)

■ It is preferable that the writing disclose a description which is itself definite and certain, but this is not always required in order to satisfy the statute of frauds. (*Beverage, supra,* 43 Cal.2d at p. 774.) A description fulfills the test of reasonable certainty if it furnishes the "means or key" by which the description may be made certain and identified with its location on the ground. (*Ibid.*) In this regard, "[c]ourts have been most liberal in construing executory contracts for the sale of real estate and have sought, as far as is consistent with the above established rules, to give effect to the intention of the parties in applying descriptions to property." (*Id.* at p. 775.)

In addition to the statute of frauds, the present appeal implicates the general rules regarding consideration of parol evidence. ■ Parol evidence is admissible to identify the property mentioned in a written agreement; however, it has been held that such evidence may not be used to supply a description that the parties entirely omitted from the writing. (*Ganiats Construction, Inc. v. Hesse* (1960) 180 Cal.App.2d 377, 384 [4 Cal.Rptr. 706] (*Ganiats*).)

2. *The Statute of Frauds Does Not Bar Consideration of Extrinsic or Parol Evidence Coming into Existence After the Execution of the Agreement to Show the Boundaries of the Lands in Question.*

The 22-acre rail yard at the heart of this dispute was not owned by either party in 1924, and was not specifically described in the initial repurchase option entered into by the City and ABL. The critical legal issue presented, therefore, is whether the statute of frauds bars admission of parol or extrinsic evidence showing a delineation of the property that occurred after execution of the contract. (See *Beverage, supra,* 43 Cal.2d at p. 774.)

ABL maintains that the statute of frauds only permits the use of parol or extrinsic evidence to describe property that was in the seller's possession *at the time* the agreement was executed. ABL however fails to bring to our attention any authority specifically endorsing or addressing this legal argument, and the City has also been unable to find any such authority. Instead, ABL simply argues it would be inconsistent with the statute of frauds to use extrinsic or parol evidence in identifying property that was to be acquired after the signing of the written agreement.

We find the most relevant authority on this point is a federal decision not cited by the parties, *Love v. U.S.* (E.D.N.C. 1994) 889 F.Supp. 1548 (*Love*). There, a railroad company had contracted in 1853 for the right to purchase land in North Carolina, upon which the railroad desired to lay track for future operations. (*Id.* at p. 1550.) The contract gave the railroad the right to select the specific parcels to be used for these future operations, which therefore were not specifically described in the agreement itself. About 20 years after the original contract was signed, the railroad selected certain property for its right of way and operated a railroad on that land for many years. (*Id.* at pp. 1550–1551.)

After the railroad ceased operations over a hundred years later, a dispute arose as to ownership of the land which had been formerly occupied by the railroad's right of way. One of the legal questions presented was whether the original 1853 contract violated the North Carolina statute of frauds, which was similar in relevant part to our California statute of frauds. (*Love, supra,* 889 F.Supp. at p. 1564.) The United States government contended that the statute of frauds voided the agreement, because the land conveyed was not described in the agreement, and the land in question could only be established by extrinsic evidence arising years later, showing the land selected for the new railroad operations. The federal district court however rejected the contention that the statute of frauds voided the agreement, and held that "a contract can be made sufficiently definite by the railroad's subsequent selection of the property." (*Id.* at pp. 1564–1565.) ■ Thus, *Love* stands for the proposition that the statute of frauds may be satisfied where, as here, the contract provides that a buyer will select and acquire certain lands *after* the original written contract is executed. Extrinsic evidence may then be considered to show which lands were acquired, and their boundaries. This result is in accord with the general principle of California law that a "means or key" may be used to define the relevant land, so as to avoid invalidity under the statute of frauds. (*Beverage, supra,* 43 Cal.2d at p. 774.)

■ Guided by *Beverage* and *Love*, we agree with the City that the contractual language, "said belt line railroad including *all extensions thereof*," (italics added) is a sufficient "means or key" by which extrinsic or parol evidence could be used to define the property which is the subject of the option. According to the City, extrinsic or parol evidence could identify the lands in question, using this means or key: "The ABL certainly cannot deny it has legal descriptions of the original railroad property and of all of the property it acquired for the extensions of the railroad. . . . The conveyance documents for the original railroad and later acquired property for the extensions make the property to be conveyed identifiable, and in compliance with the statute of frauds." As in *Beverage* and *Love*, such evidence, together with the contractual language, could be considered as a means or key to satisfy the statute of frauds.

Other relevant California precedents are also consistent with the result we reach. Perhaps the closest California case is *Hansen Pacific Corp. v. Buck Mountain Logging Co.* (1961) 191 Cal.App.2d 826, 832 [13 Cal.Rptr. 82] (*Hansen*), in which two companies contracted to sell land described as " 'our timber and timberlands in the Briceland area which we acquired from Walter G. Brix.' " The court found this admittedly vague description sufficient to satisfy the statute of frauds, because it could be supplemented by additional evidence acquired after the execution of the contract, i.e., certain title reports given to the plaintiff afterwards. In the words of the court, "it seems clear that the parties understood what land was described in the defendant's offer, as is illustrated by the title reports which were given to plaintiff following the execution of the first agreement." (*Hansen, supra,* at p. 833.)

Significantly, in *Hansen, supra,* the title reports "given to plaintiff *following the execution of the first agreement*" were considered in helping to identify the land and satisfy the statute of frauds. (*Hansen, supra,* 191 Cal.App.2d at p. 833, italics added.) Similarly, ABL was required, following the execution of the original 1924 agreement, to "keep an accurate account of the cost of additional investments and extensions, and file a verified report thereof annually with the City Clerk of said City, similar to the report filed with the Railroad Commission." These reports of newly acquired extension property, after the execution of the initial agreement, served the purpose of identifying the property constituting "extensions thereof" and thus could satisfy the statute of frauds, as a "means or key" of contract interpretation. (See *Beverage, supra,* 43 Cal.2d at p. 774; cf. *Seaman's Direct Buying Service, Inc., v. Standard Oil Co.* (1984) 36 Cal.3d 752, 763, fn. 2 [206 Cal.Rptr. 354, 686 P.2d 1158] [observing that extrinsic evidence would be admissible to satisfy the statute of frauds and clarify any ambiguities in the parties' agreement.] (*Seaman's*), overruled in part on other grounds by *Freeman & Mills, Inc. v. Belcher Oil Co.* (1995) 11 Cal.4th 85, 102–103 [44 Cal.Rptr.2d 420, 900 P.2d 669].)

### 3. *Parol Evidence Could Also Make the Agreement Sufficiently Certain.*

Respondent nevertheless argues the term "extensions thereof" cannot be a "means or key" because the term "extensions thereof" is so vague and uncertain as to be useless, and could potentially apply either to all lands ABL acquired after the execution of the agreement of 1924, or alternatively could refer only to the tracks of the railroad extensions themselves, without the underlying land acquired by ABL. We must therefore next determine whether the language of the agreement could meet the requirements for certainty under California law, in addition to the statute of frauds.

■ In deciding whether contract terms are sufficiently certain, the modern legal trend "favors carrying out the parties' intention through the enforcement of contracts and disfavors holding them unenforceable because of uncertainty. [Citations.] The defense of uncertainty has validity only when the uncertainty or incompleteness of the contract prevents the court from knowing what to enforce." (*Hennefer v. Butcher* (1986) 182 Cal.App.3d 492, 500 [227 Cal.Rptr. 318], fn. omitted (*Hennefer*).)

For example, in the older case of *Harris v. Larter* (1940) 36 Cal.App.2d 587, 593 [97 P.2d 1035], a husband agreed to convey to his wife his interest in certain property held by them, and she agreed to "take a living out of [it]" and divide it "fifty-fifty" between his relatives and hers upon her death. Such an agreement was found to be too uncertain to enforce, since there was no language showing which members of the respective families should share in the remains or what proportion they should receive. The case at bar is distinguishable, in that the track extensions have been created, and as a "means or key" the reference to extensions would specify lands that can now be identified in a particular county of a particular state, to the exclusion of other land. (See *Love, supra,* 889 F.Supp. at p. 1564; *Beverage, supra,* 43 Cal.2d at p. 774.)

We also distinguish a case relied on by ABL, *Ganiats, supra,* 180 Cal.App.2d 377, 384. There, the parties sought to create an option to acquire the "next contiguous" 30 acres adjacent to a specified parcel. The appellate court agreed parol evidence could be considered to satisfy the statute of frauds, but nonetheless found the parol evidence in that case insufficient to identify the bounds of the 30 acres subject to the option. There were an infinite number of combinations or configurations of 30 acres that could be "contiguous" to the specified parcel, and in fact the prospective buyer had at various times suggested three different parcels of that size as being subject to the option. (*Id.* at pp. 384–385.) Once again, the present case is distinguishable, because parol evidence can identify the "extensions thereof" that have been created in the past, and which serve as a "means or key" to identify the lands subject to the option. (See *Love, supra,* 889 F.Supp. at p. 1564; *Beverage, supra,* 43 Cal.2d at p. 774.)

Furthermore, a case cited in *Beverage* for its rule regarding the use of parol evidence in light of a "means or key" was *Johnson v. Schimpf* (1925) 197 Cal. 43, 48 [239 P. 401]. In *Johnson,* the parties agreed to the sale of a property which was not completely described, and was only "identified by occupancy" as the property occupied by certain slaughterhouses, corrals, and other appurtenant buildings. (*Id.* at p. 49.) The high court held this description "could be made more certain, if need be, by the introduction of parol evidence to show what portion the parties intended to be embraced in

the parcel to be conveyed." (*Ibid.*) Likewise, in the present case, land occupied by the later-built extensions may be "identified by occupancy" and may be made more certain by parol evidence.

We agree the repurchase option in this case is somewhat unusual, since it sought to include not only the original railroad, but also property that was to be acquired in the future for "extensions thereof." However, this unusual feature does not necessarily make the 1924 agreement fatally uncertain. The language of the option greatly narrows and defines the property in issue, insofar as it limits the City's right to repurchase the original railroad and its "extensions *thereof.*" (Italics added.) Only the original property, or new lands or other property acquired to provide "extensions" of the operations of the original railroad, would seemingly be covered by the repurchase option. If ABL acquired other property for nonrailroad purposes, such property would not fall within the option to repurchase. As to the contention that the right of repurchase of the "extensions thereof" might refer either to all newly acquired lands, or only to the tracks themselves and not the land underneath those tracks, we again point out that extrinsic evidence might be considered to aid in the resolution of this asserted ambiguity. (See *Seaman's, supra,* 36 Cal.3d at p. 763, fn. 2 [extrinsic evidence may be used to resolve ambiguities in an agreement].)

The parties' agreement not only put ABL on notice that the City could reacquire the original branch railroad, as well as "extensions thereof" to be added to the rail system at a later date, but it required ABL to provide periodic financial reports to the City regarding any such extensions. This provision, and any resulting reports or other documents such as deeds, could aid in clarifying the parties' intentions. (See *Hennefer, supra,* 182 Cal.App.3d at pp. 500–501 [In a real property transaction, parol or extrinsic evidence could be used to explain the meaning of ambiguous contractual terms and make them sufficiently certain.].) Of course, it is possible the extrinsic or parol evidence will show that the intention of the parties was simply to allow for a repurchase of the extension of the tracks, and not the disputed land, but a determination as to that issue is not yet before us on appeal.

In summary, we see two steps in the interpretation of the agreement entered into between the City and ABL. First, extrinsic or parol evidence may be considered to ascertain the parties' meaning of the words "extensions thereof" when they entered into the contract. Second, guided by this evidence, it could be determined with certainty whether the real property in issue here is subject to the repurchase option of the agreement. We do not yet know what will be concluded, in light of the extrinsic or parol evidence. We only rule that the order granting summary judgment against the City should be vacated, in order to allow for further proceedings consistent with the views expressed in this opinion.

## III. *DISPOSITION*

The order granting summary judgment and the judgment itself are vacated. The matter is remanded for further proceedings consistent with this opinion. The City shall recover its costs on appeal.

Jones, P. J., and Gemello, J., concurred.

Respondent's petition for review by the Supreme Court was denied January 28, 2004. George, C. J., did not participate therein.