[Civ. No. 41445. Second Dist., Div. Two. Mar. 26, 1974.]

AMERICAN-HAWAIIAN STEAMSHIP COMPANY et al.,
Plaintiffs, Cross-defendants and Appellants, v.
HOME SAVINGS AND LOAN ASSOCIATION et al.,
Defendants, Cross-complainants and Appellants;
METROPOLITAN DEVELOPMENT CORPORATION et al.,
Defendants, Cross-complainants and Respondents;
CALLEGUAS MUNICIPAL WATER DISTRICT,
Defendant, Cross-defendant and Appellant;
LESTER HOPE et al.,
Defendants, Cross-defendants and Respondents.

74

## COUNSEL

Lucking, Bertelsen & Bysshe, Lucking, Bertelsen, Bysshe & Kuttler, William A. Lucking, Jr., and Karl H. Bertelsen for Plaintiffs, Cross-defendants and Appellants.

James E. Dixon, John R. Engman, Bruce W. Fletcher, J. Roger Gelsinger, Keith Holaday, George N. Nicoletti and James A. McLaughlin for Defendants, Cross-complainants and Appellants.

J. F. Goux for Defendant, Cross-defendant and Appellant.

John Amos Fleming for Defendants, Cross-complainants and Respondents.

No appearance for Defendants, Cross-defendants and Respondents.

## OPINION

**FLEMING, J.** — Cross-appeals in cross-actions for declaratory relief to allocate costs of construction by the Calleguas Municipal Water District for a $4 million water system serving five southeastern Ventura County properties separately owned by American-Hawaiian Steamship Company, Metropolitan Development Corporation, Lester Hope, Lillian Barrett, and Home Savings and Loan Association.[1]

---

[1] We have simplified designation of the parties. More completely, American-Hawaiian succeeded to the interest of the Albertson Ranch Company; its own water purveyor, the Russell Valley Municipal Water District, joins in the cause. Metropolitan's own water purveyor, the Metropolitan Water Company, also joins in the cause. Home succeeded to the interest of the Crummer Ranch Company; the Ahmanson Bank and Trust Company joins Home in the cause along with Home and Ahmanson's own water purveyor, Mesa Water Company.

Neither Hope nor Barrett actively participated in the trial or on this appeal. Hope's interest appears to lie with American-Hawaiian and Metropolitan; Barrett's interest appears to lie with Home and Calleguas.

Calleguas annexed the five properties and contiguous lands pursuant to its Ordinance No. 3 adopted by the Calleguas board on 30 January 1963 and approved by the residents of the annexed area in an election on 5 March 1963. Subdivision 5 of section 3 of Ordinance No. 3 provides: "Calleguas will construct, as reasonably warranted and required, the feeder line or lines upon request for water service from water purveyors in the annexing area. *Calleguas will be reimbursed for the cost of the whole of said line or lines, including all incidental costs, by the purveyors on a pro-rata basis of installed capacity of said line at time of request for service.* Said feeder line or lines shall be the property of Calleguas and be operated and maintained by Calleguas." (Italics added.)

The principal problem presented by this cause is the interpretation of the emphasized portion of the ordinance.

### BACKGROUND

Calleguas is a wholesale purveyor of water in southeastern Ventura County. In 1960 it began to construct a system to bring water to the district from the Los Angeles area. Metropolitan asked Calleguas to supply water for a development Metropolitan planned for 2,850 acres of land north of Highway 101 in the Simi Hills just outside the border of the Calleguas District. Calleguas hesitated because it preferred to plan for an entire area, not single landowners. Eventually 4 other landowners representing another 15,000 acres of undeveloped land joined in Metropolitan's request for annexation to the district. Not all the landowners planned immediate development, but all wanted an assured source of water for the future. In 1963 Calleguas annexed the 18,000 acres of the 5 landowners and an additional 5,000 acres of 11 other landowners pursuant to Ordinance No. 3.

After the annexation, Calleguas prepared final plans for the "Lindero Feeder," a water system with capacity to provide 50.60 cubic feet per second (c.f.s.) of water to the 5 landowners. The system ran west to east from the main Calleguas line through each of the five properties, providing water in succession to American-Hawaiian (22.00 c.f.s.), Metropolitan (10.00 c.f.s.), Hope (2.61 c.f.s.), Barrett (2.29 c.f.s.), and ending in the middle of the Home property (13.70 c.f.s.).

In December 1964 a dispute erupted over allocation of the costs of the system. Calleguas delayed construction of the Lindero Feeder until August 1966, at which time the landowners advanced the funds for construction

allocated as demanded by Calleguas[2] with the understanding that these actions for declaratory relief could be brought to determine the propriety of a different allocation of costs. Calleguas then completed construction of the Lindero Feeder at a cost of $4,280,737.47.

## POTENTIAL ALLOCATIONS

At trial the parties advocated three potential allocations:

The *straight capacity* method (supported by Home and Calleguas) allocates a share of the cost of the whole water system to each landowner in direct proportion to his share of the whole capacity of the system. If the system has a total capacity of 10 c.f.s. and the landowner receives 1 c.f.s. he pays 10 percent of the cost of the whole system. On the assumption that future land development will correspond to the amount of water delivered to the land, advocates of the straight capacity method argue that it spreads the cost and the savings of the entire system evenly among the ultimate consumers on a per capita basis.

The *reaches* method (supported by Metropolitan) allocates cost to a landowner according to his proportionate share of the system, but only for the portions or "reaches" of the system which bring water to his land, not for reaches of the system "downstream" from the last access on his property. The landowner at the end of the line pays a share of the cost of the whole line, but a landowner near the beginning of the line pays only as though the line ended at his land. Advocates of the reaches method argue that each landowner shares in the savings of the entire system but pays only for what he uses.

The *alternative-facilities* method (supported by American-Hawaiian) allocates costs of the whole system to a landowner in proportion to the savings he incurs by participating in a joint system compared to the cost of building a separate system to deliver the same amount of water to his land. Advocates of the alternative-facilities method argue that it spreads the savings incurred by construction of a joint system equitably among the individual landowners.

---

[2]The landowners advanced funds as follows:

|  |  |
|---|---|
| American-Hawaiian | $1,825,646.98 |
| Metropolitan | 829,840.17 |
| Hope | 216,034.63 |
| Barrett | 190,589.04 |
| Home | 1,136,878.65 |
| TOTAL | $4,198,989.47 |

Home and American-Hawaiian assumed interim responsibilities for Barrett's share. Calleguas assumed interim responsibility for Hope's share.

## DISPOSITION IN TRIAL COURT

The trial court heard the cause without a jury and found: The landowners contracted among themselves and with Calleguas for construction of the Lindero Feeder and for allocation of the costs of construction. The Calleguas Board memorialized this contract in Ordinance No. 3. However, the language of the ordinance had no plain, ordinary meaning and required judicial interpretation as to allocation of construction costs. "[T]he cost of the whole of said line" did not mean the whole of the line, "pro rata" did not mean strict proportionate allocation, and "basis of installed capacity" did not mean the basis of 50.60 c.f.s. of actual installed capacity. The court concluded that although both the reaches and alternative-facilities method of allocation were within the purview of the language of the ordinance, the landowners and Calleguas intended the language of the ordinance to memorialize the reaches method of allocation.[3]

## POSITIONS OF PARTIES ON APPEAL

Calleguas and Home contend the judgment should be reversed insofar as it interprets the ordinance. They argue that the court erred in treating the ordinance as a contract, that construed as a legislative enactment the ordinance plainly contemplates the straight-capacity method for allocation of costs.

American-Hawaiian (no longer urging the alternative-facilities method) and Metropolitan contend the judgment should be affirmed. They argue the ordinance comprises a contract as well as a legislative enactment and should be construed as a contract. Since the language of the contract is ambiguous, it should be construed in the light of its surrounding circumstances, and the circumstances support the trial court's finding that the contract contemplated the reaches method of cost allocation.

American-Hawaiian on its own "protective" appeal contends the facts show, and the trial court should have found, that the Calleguas board sub-

---

[3]Based on the reaches method, the trial court allocated costs as follows:

| | |
|---|---|
| American-Hawaiian | $1,282,311.76 |
| Metropolitan | 721,744.97 |
| Hope | 210,305.63 |
| Barrett | 264,504.38 |
| Home | 1,720,122.73 |
| Subtotal (see fn. 2) | 4,198,989.47 |
| Calleguas (unallocable costs) | 81,748.00 |
| Total cost | $4,280,737.47 |

sequently abandoned the straight-capacity interpretation it originally placed on its ordinance.

## DISCUSSION

■ Preliminarily, we dispose of two procedural issues. First, Calleguas has standing on this appeal. It is more than a mere stakeholder, for it advanced money on behalf of Hope under the interim agreement of August 1966.

■ Second, other landowners are not indispensable parties to this action. The parties sought the assistance of the court to interpret an agreement between the five landowners and Calleguas. The ordinance memorialized that agreement. The court's interpretation of the language of the ordinance relates to the contractual nature of the ordinance and not to its statutory nature. Other landowners did not participate in the agreement to construct the Lindero Feeder and are not bound by the court's interpretation of the agreement. We turn to the merits.

■ Ordinance No. 3 must be interpreted as a contract, not merely as a legislative enactment. Municipal entities are often required to enact ordinances to enable the making of contracts, but the contracts are no less contractual in nature because they are likewise ordinances. ■ A municipal entity's acceptance of an offer by enactment of an ordinance creates a binding contract (10 McQuillin, Municipal Corporations (rev. ed. 1966) § 29.03, p. 218), and the ordinance serves to memorialize the agreement and thereby satisfy the statute of frauds. (*People* v. *Supervisors of S. F.*, 27 Cal. 655, 678.)

■ The evidence amply justifies the trial court's finding that the five landowners and Calleguas entered into a contract for a water system.[4] Before instituting annexation proceedings, Calleguas required the landowners (with the explicit exception of Barrett) to deposit an annexation fee of $25 per acre. Calleguas imposed this fee, which was in addition to any charges for construction of a feeder system to serve the annexed area, to equalize contributions between the new landowners and the old landowners for costs of construction of the District's basic water system

---

[4]Home claims the contract issue was an afterthought and not properly in issue at trial. We disagree. An amendment to the pretrial order clearly raised the contract issue: "What is the agreement of the landowner-purveyors as to the allocation of costs, as between themselves, of said Lindero Feeder?" Ordinance No. 3 is the only agreement presented which makes a permanent allocation of costs of the Lindero Feeder.

incurred before the annexed lands joined the system. The five landowners placed the $470,260.25 annexation fee in escrow prior to the time Calleguas carried out the annexation. Obviously, Calleguas and the landowners knew why the landowners made the contribution: the parties contemplated that Calleguas would extend its basic water delivery system to serve the five landowners. This clear inference is supported by the testimony of Allan Boyar of Metropolitan, of Archie Hill of Calleguas, and of A. J. Dietsch of American-Hawaiian, all to the effect that the landowners discussed the terms of annexation among themselves and with Archie Hill, and attended meetings when the Calleguas Board discussed the term of annexation.[5]

The disputed language of Ordinance No. 3 is unambiguous on its face. Each landowner must reimburse Calleguas for the cost of the whole line based on the landowner's proportionate share of the capacity of the line. The language neither says nor implies anything about reaches or variance in a landowner's share of costs depending on the landowner's location on the line.

Under certain circumstances, however, even apparently unambiguous language in a contract may become subject to interpretation. The opinion in *Pacific Gas & E. Co.* v. *G. W. Thomas Drayage etc. Co.,* 69 Cal.2d 33, 39-40 [69 Cal.Rptr. 561, 442 P.2d 641, 40 A.L.R.3d 1373], sets out the rules: in interpreting a contract a court should give preliminary consideration to all credible evidence offered to prove the intention of the parties in connection with the making of the contract. Such evidence includes the circumstances surrounding the contract's execution, its object, nature, and subject matter, and the situation of the parties at the time of contracting. If after considering this evidence the court decides that the language of the contract is fairly susceptible to the diverse interpretations contended for, then the contract is ambiguous, and extrinsic evidence is admissible to prove any of the diverse interpretations. (See also *Tahoe National Bank* v. *Phillips,* 4 Cal.3d 11, 22 [92 Cal.Rptr. 704, 480 P.2d 320].)

Does the extrinsic evidence here reveal more than one possible meaning to the unambiguous language of the ordinance? We think not. Several technical experts testified to various methods by which costs *could* have been allocated and opined that authorization for those methods could

---

[5]Home claims the Brown Act (Gov. Code, § 54950 et seq.) voids any agreement made here because the Calleguas board did not enter into the agreement in a public meeting. Home did not raise this claim at trial, and we are convinced in any event that the claim lacks merit. We perceive no secret agreement. Ordinance No. 3 memorializes the agreement between landowners and Board, and the Board enacted the ordinance in a public meeting.

be squeezed out of the language of the ordinance. But technical experts did not make this agreement; rather it was made by landowners and the board of a municipal water district. ■ The words of a contract must be understood in their ordinary and popular sense unless they are words whose very use implies they are terms of technical significance. (Civ. Code, § 1644; *Johanson* v. *Riverside Co. Select Groves,* 4 Cal.App.2d 114, 122 [40 P.2d 530].)

■ The vast majority of witnesses who testified about intent in relation to the language of the ordinance declared it was intended to allocate costs of construction by the straight-capacity method. These witnesses included the four surviving Calleguas board members and the Calleguas general manager, Archie Hill. In opposition, one witness for Metropolitan, Allan Boyar, testified that he participated in preliminary negotiations representing Metropolitan, that he discussed the reach method with Archie Hill, and that he insisted each landowner "pay his own freight." Additionally, Simon Perliter, a consulting engineer retained by Calleguas, testified he made early cost allocation estimates based on the reaches method, but on later reading the ordinance he realized he had made a mistake and that the ordinance called for the straight-capacity method.

In sum, we find no evidence to substantially undermine the patent meaning of the language of the ordinance or make it susceptible to divergent interpretations. The fact that one landowner wanted each landowner to "pay his own freight" hardly translates into positive support for the reaches method. The consulting engineer's initial mistaken assumption, made prior to the time he had read the ordinance, proves little. On reviewing the evidence we conclude the trial court erred in finding that language of the ordinance ambiguous and attaching to that language any meaning other than its obvious one. ■ Courts through the medium of construction may not put into contracts provisions that are not already there. (*Ede* v. *Ede,* 208 Cal.App.2d 718, 721 [25 Cal.Rptr. 576]; Civ. Code, § 1638.)

Finally, we reject American-Hawaiian's contention on its "protective" appeal that the trial court should have found an abandonment by Calleguas of its straight-capacity interpretation of the ordinance. When the board grew weary of bickering with the landowners over costs, it merely asked the landowners to try to work out their own allocation of costs; no evidence shows the board ever abandoned its own position on the method of allocation it thought the landowners should use.

The judgment is reversed, and the cause remanded to the trial court for new findings and entry of judgment in accordance with this opinion. Costs in favor of Calleguas and Home, and against Metropolitan and American-Hawaiian.

Roth, P. J., and Beach, J., concurred.

The petitions for a rehearing were denied April 24, 1974, and the petitions of the plaintiffs, cross-defendants and appellants and defendants, cross-complainants and respondents for a hearing by the Supreme Court were denied May 22, 1974. Clark, J., did not participate therein.