[No. B114270. Second Dist., Div. Seven. Feb. 17, 1999.]

SKIP BALDWIN et al., Plaintiffs and Appellants, v.
CITY OF LOS ANGELES, Defendant and Respondent;
HABITAT FOR HUMANITY, HARBOR AREA/LONG BEACH, CA
INC., et al., Real Parties in Interest and Respondents.

[No. B121348. Second Dist., Div. Seven. Feb. 17, 1999.]

SKIP BALDWIN et al., Plaintiffs and Respondents, v.
CITY OF LOS ANGELES, Defendant and Appellant;
HABITAT FOR HUMANITY, HARBOR AREA/LONG BEACH, CA
INC., Real Party in Interest and Appellant.

## COUNSEL

Skip Baldwin, in pro. per.; Lucy P. Mejia, in pro. per.; and Frank O'Brien, in pro. per., for Plaintiffs and Appellants and for Plaintiffs and Respondents.

James K. Hahn, City Attorney, Julie Downey, Patricia V. Tubert and William L. Waterhouse, Assistant City Attorneys, and Jess J. Gonzalez, Deputy City Attorney, for Defendant and Appellant and for Defendant and Respondent.

Cox, Castle & Nicholson, Kenneth B. Bley and Patrick A. Perry for Real Party in Interest and Appellant and for Real Party in Interest and Respondent Habitat for Humanity, Harbor Area/Long Beach, CA Inc.

Lowell & Robbin and David S. Robbin for Real Party in Interest and Respondent Union Pacific Railroad Company.

OPINION

LILLIE, P. J.—

These consolidated appeals involve challenges by three residents of the Wilmington area of the City of Los Angeles to an owner-occupied affordable housing project, consisting of thirteen duplexes, or a total of twenty-six residences, which real party in interest Habitat for Humanity, Harbor Area/ Long Beach, CA Inc. (Habitat) proposed to build on a two-acre parcel of property transferred to Habitat by defendant City of Los Angeles (City); the property had been dedicated to City by Southern Pacific Real Estate Enterprises (Southern Pacific).

In one appeal (No. B114270), the residents (Baldwin) appeal from a July 1, 1997, judgment confirming City's return to writ of mandate and dismissing Baldwin's prior writ of mandate wherein Baldwin challenged City's adoption of a mitigated negative declaration for Habitat's housing project and contended that City was obligated to prepare an environmental impact report for the Habitat project pursuant to the California Environmental Quality Act (CEQA; Pub. Resources Code, § 21000 et seq.).

In appeal No. B121348, City and Habitat appeal from a judgment granting a second petition for writ of mandate filed by Baldwin wherein Baldwin successfully challenged City's adoption of an ordinance on October 22, 1997, authorizing transfer and sale of the approximately two-acre project site to Habitat; the judgment determined that by ordinance adopted in 1976, City accepted Southern Pacific's donation deed restricting use of the property to "public recreation and beautification purposes," which constituted an irrevocable dedication and prevented City from thereafter attempting to lift the use restriction, and from selling or transferring the property for use as a private housing project.

Inasmuch as both appeals involve essentially the same underlying factual and administrative proceedings, we set out one factual and procedural background for consideration of both appeals.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *Administrative Proceedings.*

Habitat is a nonprofit religious corporation with a housing ministry dedicated to providing affordable housing. This case involves Habitat's proposal to build 13 duplexes, a total of 26 residences, in the Wilmington area of City. The project site is surrounded by single-family residences in an area containing many oil-refining and maritime-related industries. The proposed project site consists of about 2 acres of a larger 7.2-acre narrow strip of land about 120 feet wide, known as parcel 3, and which was formerly a railroad right of way owned by Southern Pacific. Although it is undisputed in these appeals that the property was dedicated to City by Southern Pacific, a disputed issue before us on one of the appeals is whether the dedication as to parcel 3 was accepted by City with or without a park use restriction. Parcel 3, about 2.66 acres, has been a vacant dirt lot since about 1970, although in the 1980's City developed about 4 acres immediately north of the project site as a park, known as the East Wilmington Greenbelt Park, with recreational facilities and grassy open space. The dedication and use of the *northern four acres* as a park is not an issue or in dispute in these lawsuits.

In July 1970, City entered into a 3-year lease with Southern Pacific for the use of the entire 7.2 acres, including parcel 3, for recreation and park purposes; the City Department of Recreation and Parks planted the northern 4 acres (parcels 1 and 2) with lawn and other landscaping, and constructed improvements such as fences and baseball backstops, which were maintained by City over the years and continued up to the present time; this area is known as the "Greenbelt Park" or "East Wilmington Greenbelt Park." At the expiration of the lease in 1973, City requested that Southern Pacific renew the lease for a period of 25 years or more to make the property eligible for federal and state development funding; the parties entered into negotiations, and by letter dated March 31, 1976, Southern Pacific proposed donation of the 7.2 acres to City "for public recreation and beautification purposes" and "conditioned upon the City of Los Angeles assuming the responsibility in removing rails and restoring streets where railroad tracks have previously been retired in the nearby vicinity." A May 1976 report of City's recreation and parks committee, adopted by the city council on June 21, 1976, noted that an estimated value of $600,000 had been placed on the property, and total costs of removing tracks and restoring streets would total about $200,000; acquisition of the property, however, would be profitable to the City; the report also recommended that if City decided to accept the property, the matter should be referred to the city attorney to work out the terms

of an agreement with Southern Pacific in that "there may be legal problems relating to removal of the tracks and restoration of the streets . . . ."[1]

On November 4, 1976, City's board of recreation and park commissioners adopted Resolution No. 7411 approving of the acquisition of the real property for recreation and park purposes and approving of a proposed agreement and conveyance by which the property was to be quitclaimed to City, as well as a proposed ordinance prepared by the city attorney authorizing the execution of the proposed agreement and conveyance.

Thereafter, the city council adopted City Ordinance No. 149,131, which became effective on January 14, 1977. The ordinance provided that the real property at issue herein "may be acquired by the City of Los Angeles subject to the City assuming any obligation which may exist to remove railroad tracks and railroad facilities located within said real property; and also subject to the City assuming any obligation to remove railroad tracks and railroad facilities and restore street areas where the railroad facilities are located . . . . The Mayor of the City of Los Angeles is authorized to execute a form of agreement and conveyance to relieve [Southern Pacific] of the obligation to remove tracks and restore street facilities, as set forth above and to accept on behalf of the City the real property to be donated to the City."

On February 2, 1977, Southern Pacific sent a letter to Councilman Gibson of the 15th District, where the property is situated, enclosing the original donation deed for the property. The letter stated that "Delivery of this instrument is conditioned upon receipt of the following data: [¶] (1) A Certified Copy of the Resolution adopted by the City Council of the City of Los Angeles, accepting the Donation Deed. [¶] (2) That City of Los Angeles will furnish complete recording data, to the undersigned." The letter concluded that it was with pleasure that Southern Pacific was able to accommodate City "by donation of the land for park purposes to benefit the community of Wilmington." The donation deed recited that the property was given

---

[1] "[T]he manner in which a city is empowered to form a contract is generally a 'municipal affair' which can be controlled by the terms of its charter. . . . Thus if a city charter specifies the manner in which that city may enter into a contract, the terms of the charter control over otherwise applicable state law. . . . [¶] The Charter of the City of Los Angeles contains a section which generally specifies the procedures according to which the City may be bound to a contract. (L.A. City Charter, art. XXVIII, § 385 (Section 385).)" (*First Street Plaza Partners v. City of Los Angeles* (1998) 65 Cal.App.4th 650, 661-662 [76 Cal.Rptr.2d 626].) "The Charter of the City of Los Angeles plainly mandates [in Section 385] that a city contract of the type involved here must be signed by the mayor, be approved by the city council, and be approved as to form by the city attorney." (*Id.* at p. 663.)

to City "for use by the public as a park, but subject to easements, covenants, conditions, reservations and restrictions of record."

A March 3, 1977, report of the general manager of the board of recreation and park commissioners stated that Southern Pacific's donation deed and February 2, 1997, letter were on file in the board office; according to the city attorney, Southern Pacific had not executed the agreement and conveyance prepared by the city attorney's office, nor any similar agreement; the city attorney and bureau of right of way and land obtained certified copies of four deeds to Southern Pacific relating to the property; two deeds contained reversionary clauses which may render title which City is to receive defective; in addition, as Southern Pacific's letter specified that the donation "is to be accepted by Council resolution, it appears to be beyond the power of the Board to accept the donation." The general manager recommended that the matter be referred to the city council for consideration, and that "the opinions of the City Attorney and Bureau of Right of Way and Land be obtained regarding the validity of the property interests to be donated."

By report dated June 23, 1977, the city attorney informed the recreation and parks committee of the city council that Southern Pacific's donation deed included property deeded to Southern Pacific in 1903 by four deeds referring to four parcels; the city attorney concluded that Southern Pacific's donation deed would convey good title to parcels 3 and 4, but Southern Pacific's interest in parcels 1 and 2 may have terminated upon cessation of railroad services in the 1960's. The city attorney also noted that City did not know how much of the land described in the donation deed was attributable to the grants as to parcels 1 and 2, which were defective, or to parcels 3 and 4, as to which City would obtain good title. Thereafter the city attorney's office and the department of parks and recreation contacted the grantors to Southern Pacific of parcels 1 and 2, to ask them for quitclaim deeds to City of their purported reversionary interests in the properties. The owner of the purported claim of reversion as to parcel 2 executed a quitclaim deed to City, but the reversionary owners as to parcel 1 held their interest in a trust, the Patton Trust; the trustee of the Patton Trust informed City that the trustee was not in a position to donate any of the trust's assets, but would consider any offer of City to purchase the property.

In a September 24, 1979, report by the city attorney to the city council, the city attorney noted that the value of parcel 1 was about $300,000; the city attorney recommended that City either return the donation deed to Southern Pacific with a request that Southern Pacific donate to City parcels 2, 3, and 4, or that City accept the existing deed and immediately commence an action

to quiet title as to parcel 1 with a cause of action for eminent domain. The report concluded: "However, because of the chance of losing the quiet title portion of the action, an appropriation of $300,000 or more must be made to pay for the parcel."

By letter to Southern Pacific dated November 14, 1979, City's recreation, library and cultural arts committee (Committee) returned to Southern Pacific the donation deed covering the four parcels, stating that the city attorney had advised the Committee that the deed with respect to parcels 1 and 2 conveyed only a terminable fee. The Committee requested that Southern Pacific execute a new deed of donation covering parcels 2, 3, and 4.

In September 1981, the city attorney reported to the Committee that the matter of Southern Pacific's donation deed had been in abeyance for the last couple of years; City had levied an assessment of about $20,000 on the property and sought payment from Southern Pacific; Southern Pacific informed City that unless it was willing to accept title to all four parcels, it would convey its interests in the parcels to others, and/or quitclaim the property to the Patton Trust. The city attorney advised the Committee that since 1971, City had used parcel 1 as a park under permission from Southern Pacific, which was an adequate time to result in an adverse title or implied dedication if all other conditions therefor were met; however, "City's use of the Southern Pacific right of way as a park without first obtaining title and without checking the title of [Southern Pacific] has created a dilemma." The city attorney then set out three alternatives for City: (1) accept the donation deed as to all four parcels and be prepared to litigate title issues with the trustee of the Patton Trust; (2) accept the donation deed and commence an action in declaratory relief to establish valid title; (3) take no action but if Southern Pacific quitclaimed its interest the property to the Patton heirs, City should be prepared to terminate the park use of the Patton parcel and/or the other three parcels.

Thereafter, the city attorney discussed the matter with Southern Pacific's legal counsel; in January 1983, Southern Pacific submitted a new form of donation deed to City which quitclaimed all of its rights and interests in the property, rather than only the interests which Southern Pacific acquired under the 1903 deeds. The city attorney was of the opinion that the long use of the property as a park was sufficient to create a prescriptive right for the railroad or its successors to continue recreation and park use; the requirements to establish an implied dedication under Civil Code section 1009 were also met; accordingly, notwithstanding the earlier advice, the city attorney concluded that "it is now relatively safe to accept the deed from [Southern Pacific] donating certain parcels of land to the City of Los Angeles."

In September 1983, the Committee recommended to the city council that City accept from Southern Pacific the northern portion of the property for recreation and park purposes, as it was already mostly in use for park purposes, and that City accept the southern portion of the property, not then in use, for general purposes, under the jurisdiction of the department of general services. On September 23, 1983, the city council adopted a motion approving the foregoing recommendations by the Committee. Parcel 3 was then assigned to the jurisdiction of the department of general services; it was never assigned to the department of recreation and parks.

By a February 19, 1985, letter from the city attorney to Southern Pacific, the city attorney stated that the then councilwoman for the Wilmington area, Joan Milke Flores, believed that the public interest required that a portion of the property to the south of the existing Greenbelt Park be developed for housing; City was sending a proposed agreement between City and Southern Pacific relating to the four parcels; the agreement provided that parcels 1 and 2 would be conveyed to City for recreation and park purposes, but parcels 3 and 4 would be retained by Southern Pacific, and City would issue a quitclaim deed to Southern Pacific to eliminate any clouds on title. There is no indication in our record that Southern Pacific and City executed the foregoing proposed agreement or any other similar agreement; in a July 23, 1990, letter from Councilwoman Flores to a resident of Wilmington, Flores stated that Southern Pacific had indicated an interest in retaining and developing parcel 3 into a single-family housing development. A May 13, 1992, letter from Flores to Southern Pacific stated that she had met with a committee of the Wilmington Coordinating Council, a Wilmington volunteer community organization, to discuss the future of the property; this group and adjacent property owners were willing to meet with Southern Pacific, City's planning department and city attorney to "work toward an agreement whereby [Southern Pacific] would be allowed to reclaim some of the donated property for senior and/or low income housing in exchange for park development on the remaining donated land." There is no evidence in our record that Southern Pacific and City entered into such an agreement.

A September 7, 1993, letter from Southern Pacific to a deputy to 15th District Councilman Rudy Svorinich, Jr., stated that the 1976 donation deed from Southern Pacific to City for the land was "never recorded due to title problems and contract differences relative to limited donation grant, i.e., for 'park purposes.' The title problem was resolved; however, we could not

reach an agreement to modify the granting clause. . . . The City proceeded with development of a park over a portion of the property and left the remainder vacant, even though the deal was never formalized. [¶] Consequently, from 1976 to the present, a period in which the City has held tacit ownership of the property, Southern Pacific has been billed, under threat of a tax foreclosure, and paid public improvements assessments . . . and continues to pay property taxes on the entire site. . . . [¶] Concurring that the vacant portion of the site south of Denni Street could be better utilized as some type of private development, Southern Pacific has been working with the Habitat for Humanity to develop this portion of the site for affordable housing . . . . Two issues preclude us from finalizing this transaction, the title issue [regarding a subsurface pipeline easement in favor of Southern Pacific, which Southern Pacific wanted but was not reserved in the 1976 donation deed] and an open space overlay that was put on the property which is apparently related to the park use. [¶] Southern Pacific would propose proceeding with donation of park property, with consideration thereto to the refund of taxes and assessments paid for the existing park site only, the removal of the open space overlay and the reservation of the pipeline easement."

Thereafter, Habitat submitted a proposal to the Los Angeles Housing Department (LAHD) that City deed its interest in a portion of parcel 3 to Habitat for the development of affordable single-family homes. Habitat proposed to build 13 duplexes, or a total of 26 homes, on an area of approximately 2 acres of parcel 3. Southern Pacific indicated that it would require remuneration to release its park use deed restriction; inasmuch as City had never recorded Southern Pacific's donation or quitclaim deed to the property, Southern Pacific remained liable for property taxes and other assessments totaling about $128,000. Southern Pacific and City agreed on a price of $300,000 to remove the deed restriction and to release City from any claims by Southern Pacific relating to taxes or fees paid by Southern Pacific.

In a May 1995 amended report to the city council from the housing and community development committee, the committee recommended that (1) the city council find that it is in the best interest of City to transfer a portion of parcel 3 to Habitat for the development of housing; (2) the city council authorize the general manager of LAHD to execute the documents necessary to effectuate the transfer, subject to elimination of the use restrictions recorded against parcel 3 and acquisition of all necessary development approvals and commitments; and (3) that City authorize a $300,000 loan to Habitat for costs associated with removing the use restrictions on the property, with funds from the federal HOME Investment Partnerships Act

(42 U.S.C. § 12721 et seq.) funds; and (4) that City authorize the city attorney to negotiate and execute an agreement with Southern Pacific to remove its use restriction and to resolve title, easement, and tax issues associated with the property. On May 31, 1995, the city council adopted the foregoing amended report.

In July 1995, Habitat pursued an application for a land use determination, a form of conditional use permit, to permit it to develop its project on parcel 3, land designated in City's general plan as open space and zoned as R2-1XL-O#. The "R2" indicates that the zoning permitted a two-family dwelling or two single-family dwellings to be built on a lot; the pound symbol (#) indicates that the land is designated as open space on an applicable community or district plan, but such land may be developed if the planning commission finds to do so would further the public convenience or welfare. After hearing in September 1995, a hearing examiner recommended to the city planning commission that the application for land use determination be approved; on November 30, 1995, the planning commission approved the land use determination, subject to certain conditions not pertinent here.

In November 1995, the planning commission also adopted a mitigated negative declaration (MND) with respect to Habitat's proposed project, approving the MND issued in August 1995 by the environmental review committee of the planning department; reflecting the potential environmental impacts noted in the initial study and checklist, the MND indicated that the project had potential negative impacts requiring mitigation measures due to a shortage of parking in the area, a shortage of sewer capacity, additional demand for water, design of the parking area and access driveways, lack of open space, and consumption of nonrenewable energy resources. The MND stated that the project would not have a significant effect upon the environment provided the potential impacts were mitigated to a level of insignificance through implementation of certain conditions imposed on the granting of the land use determination, and by application of existing City ordinances, such as the sewer ordinance, grading ordinance, flood plain management specific plan, and xeriscape ordinance, which are specifically intended to mitigate such potential impacts of all projects. As a condition of approval of the land use determination, Habitat was required to obtain approval of a parking and driveway plan, provide a minimum of two off-street parking spaces per dwelling unit, and identify a mitigation monitor who would provide periodic status reports on the implementation of mitigation measures to the planning department. Baldwin appealed the foregoing planning commission's approval of the land use determination to the city council; after

hearings before the council's planning and land use management committee and the city council, the city council denied Baldwin's appeal and adopted the mitigated negative declaration.

Concurrent with the land use determination, the City Planning Commission in September 1995 approved plan amendments for the Wilmington-Harbor City Community Plans, replanning an area including parcel 3 from open space to "Low Medium I Density Residential," which corresponds to an R2 zone. In April 1996, the city council adopted a resolution approving the community plan amendments.

B. *Baldwin's Petition for Writ of Mandate Challenging the Mitigated Negative Declaration, and Further Administrative Proceedings (Appeal No. B114270).*

On April 17, 1996, Baldwin filed petition for writ of mandate under CEQA, challenging City's approval of the Habitat housing project on the ground that the MND was inadequate under CEQA and that City failed to prepare an environmental impact report (EIR) when there was substantial evidence supporting a fair argument of significant environmental impacts. After hearing on the petition on September 17, 1996, the trial court entered a judgment on October 30, 1996, granting the petition as to the first cause of action relating to the inadequacy of the MND only; the court's judgment stated that "the initial study and the mitigated negative declaration prepared by [City] failed to accurately describe the project site, its history, its ownership and the conditions or covenants relating to its use. [¶] . . . The court's ruling is not to be interpreted as a ruling on the [second, third, or fourth] causes of action or that ultimately a mitigated negative declaration may not be proper." The judgment ordered that a peremptory writ of mandate issue directing City to set aside the March 19, 1996, actions of the city council approving of the tentative tract map for the subdivision of parcel 3 and the land use determination; and to set aside the April 17, 1996, action of the city council approving the amendment of the Wilmington Community Plan to change the designation of parcel 3 from open space to low medium I density residential.

Pursuant to the judgment, City's planning department prepared another mitigated declaration in October 1996 which included information on the project site, its history, ownership and conditions or covenants relating to its use, as well as an explanation of the initial study checklist of environmental impacts and the mitigation measures which were to be imposed on the project if approved. City subsequently held hearings on the revised MND

and related land use applications for the project, including applications for approval of the subdivision, land use determination and City General Plan amendments. On February 26, 1997, City voted to find that the project would not have a significant effect on the environment for the reasons set out in the revised MND; City adopted the revised MND, granted the land use approvals, and adopted a resolution approving of the community plan amendments regarding parcel 3. On March 5, 1997, the mayor signed a concurrence letter indicating his approval of the project.

On March 6, 1997, City filed its return to the writ of mandate, containing the City record on the matter and a request that the trial court find the actions to be in compliance with CEQA and that the petition be dismissed. Baldwin filed an objection to City's return and City's February 26, 1997, approval of the project on the ground that CEQA requires that an EIR be prepared for the project because a fair argument exists that the project may cause significant environmental impacts. After hearing on June 25, 1997, the court entered an order on July 1, 1997, denying Baldwin's objection to the City's return, finding that the City's actions were in full compliance with the court's prior writ of mandate, discharging the prior writ of mandate, and dismissing the writ of mandate. Baldwin filed timely notice of appeal of the July 1, 1997, order, in legal effect a judgment. (No. B114270, or CEQA appeal.)

While the CEQA appeal was pending, City proceeded with the transfer of a portion of parcel 3 to Habitat, which action gave rise to a second petition for writ of mandate by Baldwin. Those proceedings are set out below.

C. *Land Transfer Proceedings and Related Litigation (Appeal No. B121348).*

According to an October 9, 1997, report of City's housing and community redevelopment committee, the city attorney had drafted an ordinance providing for the transfer of about a two-acre portion of parcel 3 to Habitat for the development of its housing project. The housing and community redevelopment committee recommended that city council adopt the ordinance. On October 22, 1997, the city council passed City Ordinance No. 171763, which was published on November 4, 1997.

On November 21, 1997, Baldwin filed a petition for writ of mandate challenging the transfer of the land to Habitat as in violation of the laws governing disposition of land dedicated for use as public parkland. Baldwin argued that although City did not record the 1976 donation deed with the

park use restriction, the city council authorized acceptance of the dedicated land by ordinance in 1977; such acceptance is irrevocable and City may not now eliminate the parkland use restriction established in the 1976 deed. City, Southern Pacific, and Habitat opposed the petition for writ of mandate. City maintained that the 1977 ordinance did not achieve acceptance of the donation deed, because the ordinance set out certain conditions, which never occurred because of title problems; City finally resolved title issues, negotiated with Southern Pacific to lift the park use restriction as to parcel 3, and accepted the donation of the property from Southern Pacific in 1983; such acceptance was *not* for parkland, but for general purposes. City also contended that Baldwin had waived the issue of the park use restriction by failing to raise it in the prior petition for writ of mandate challenging the MND.

After hearing on January 7, 1998, the court granted Baldwin's petition for writ of mandate, directing that City set aside its October 22, 1997, approval of the land transfer. The court's statement of decision provides: "The paramount issue in the present case is: if the City has accepted the deed of the subject land, and if the deed contains a restriction for a particular purpose without a contemplation of a right to sell the property, does the restriction amount to a dedication which is irrevocable? [¶] A reasonable interpretation of the February 2, 1997 letter from Southern Pacific recognized that the June 21, 1976 Council adoption of the Parks & Recreation Committee Report recommending acceptance of the deed followed by the City Attorney working out the necessary agreement with Southern Pacific had resulted in an offer by Southern Pacific and an acceptance by the City. [¶] Formal approval of the acquisition is manifested by the City's adoption of an ordinance on December 16, 1976. Thus, there was a 1976 acceptance of the 'Donation Deed' to the subject property 'for public recreation and beautification purposes.' The ordinance culminating the acceptance was effective January 14, 1997. [¶] The post-acceptance activity of the City attempting to modify the title or restrictions does not detract from what clearly was an acceptance of the dedication. In 1983 the City Council adopted a committee report recommending acceptance of only a portion of the property for park land. This City Council action is not an acceptance of the land; that occurred in 1976. The 1976 action was the adoption of an ordinance and approval by the mayor. The 1983 action is not only incomplete as a City action, it is after the fact of the 1976 acceptance. [¶] The failure of the City to list the subject property as 'park land' is not determinative of any issue. There is no dispute but that the donation by Southern Pacific of the subject property in East Wilmington was for 'park land.' "

City and Habitat appealed from the March 10, 1998, judgment directing that a writ of mandate issue ordering City to set aside its October 22, 1997,

approval of the land transfer to Habitat. By our order of June 10, 1998, we ordered that Baldwin's CEQA appeal be considered concurrently with City and Habitat's appeal. We proceed to address City's and Habitat's appeals from the March 10, 1998, judgment.

I

LAND TRANSFER APPEAL (NO. B121348)

■ The principal issue on this appeal is whether City proceeded according to law in transferring a portion of parcel 3 to Habitat for use as a housing project. City maintains that it did not accept Southern Pacific's donation of the property in 1976 with a park use restriction, but accepted the donation in 1983 without the park use restriction. According to Baldwin, the City accepted the property for park purposes by City Ordinance No. 149,131, effective in January 1977, thus creating a public trust; a diversion of the property from its dedicated purposes or uses incidental thereto, by transfer to Habitat, constituted an ultra vires act. (*Big Sur Properties* v. *Mott* (1976) 62 Cal.App.3d 99, 104 [132 Cal.Rptr. 835].)

■ Baldwin does not dispute City's contention that the standard of review in this traditional mandamus action is abuse of discretion for both the trial court and the appellate court. " 'We determine only whether the action taken was arbitrary, capricious or entirely lacking in evidentiary support, or whether it failed to conform to procedures required by law. Such limited review is grounded on the doctrine of separation of powers which (1) sanctions the legislative delegation of authority to the agency and (2) acknowledges the presumed expertise of the agency. [Citation.] The inquiry into arbitrariness or capriciousness is like substantial evidence review in that both require a reasonable basis for the decision.' " (*Western/California, Ltd.* v. *Dry Creek Joint Elementary School Dist.* (1996) 50 Cal.App.4th 1461, 1492 [58 Cal.Rptr.2d 220].) The ultimate question, whether the agency's action was arbitrary or capricious, is a question of law; trial and appellate courts perform the same function and the trial court's statement of decision has no conclusive effect upon us. (*Ibid.*) Where the contention raises a question of statutory construction, the issue is one of law, which we review de novo. (*Ibid.*)

■ " 'It is well settled that where a grant deed is for a specified, limited and definite purpose, the subject of the grant cannot be used for another and different purpose.' [Citations.] 'Where a tract of land is donated to a city

with a restriction upon its use—as, for instance, when it is donated or dedicated solely for a park—the city cannot legally divert the use of such property to purposes inconsistent with the terms of the grant.' " (*Big Sur Properties* v. *Mott, supra,* 62 Cal.App.3d at p. 103.)

■ "A dedication is a voluntary transfer of an interest in land and resembles both a grant and a gift. It is therefore governed by the fundamental principles which control such transactions. . . . The intention to dedicate land need not be expressly stated but can be inferred from the actions of the owner. [Citation.] There must also be an acceptance by the public of the offer to dedicate. [Citation.] Acceptance may be express or implied. [Citation.] Express acceptance occurs when formal acceptance is made by the proper authorities. [Citation.] Acceptance is implied where the public has made use of the property for a period of time which demonstrates an intention to accept dedication [citation] or where actions by the responsible public officials indicate[] an assumption of control over the property." (*Carstens* v. *California Coastal Com.* (1986) 182 Cal.App.3d 277, 285 [227 Cal.Rptr. 135].) Thus, "[a] dedication is said to have the characteristics of a contract, in that it requires both an offer and acceptance and is not binding until there has been an acceptance." (*Clay* v. *City of Los Angeles* (1971) 21 Cal.App.3d 577, 583 [98 Cal.Rptr. 582].)

■ It is important, therefore, to observe the distinction between a complete dedication and a mere offer of dedication; in the latter case there must be an acceptance, and until there is, the owner may at any time revoke and withdraw the offer. (*Myers* v. *City of Oceanside* (1907) 7 Cal.App. 87, 92 [93 P. 686].) "Thus, under basic principles of contract law, an offer of dedication which is accepted on the condition that the proffered property be improved does not result in a completed dedication, no more than does a conditional acceptance of an offer create a valid contract. A public entity's interest in streets and easements offered by dedication is necessarily limited by the conditional nature of its acceptance thereof, which depends for finality upon a subsequent acceptance after satisfactory completion of the street improvements. [Citation.] A qualified acceptance results in an outstanding offer of dedication, which has not been revoked by operation of law and which the public entity may accept upon its conditions of acceptance being met. Until the offer of dedication is unconditionally accepted, no public interest is created." (*Mikels* v. *Rager* (1991) 232 Cal.App.3d 334, 354 [284 Cal.Rptr. 87].)

■ "Municipal entities are often required to enact ordinances to enable the making of contracts, but the contracts are no less contractual in nature

because they are likewise ordinances. A municipal entity's acceptance of an offer by enactment of an ordinance creates a binding contract [citation], and the ordinance serves to memorialize the agreement and thereby satisfy the statute of frauds." (*American-Hawaiian Steamship Co.* v. *Home Sav. and Loan Assn.* (1974) 38 Cal.App.3d 73, 80 [112 Cal.Rptr. 897].)

▪ The rules applying to the construction of statutes apply equally to ordinances. (*Terminal Plaza Corp.* v. *City and County of San Francisco* (1986) 186 Cal.App.3d 814, 826 [230 Cal.Rptr. 875].) A basic rule of construction is that courts are bound to give effect to statutes and ordinances according to the usual, ordinary import of the language employed in framing them. (*Ibid.*) Another rule of construction "requires that courts avoid a construction which renders a part of the statute or ordinance 'surplusage.' [Citation.] [¶] Under well established principles the contemporaneous administrative construction of a statute or ordinance by the administrative agency charged with its enforcement is entitled to great weight and will be followed unless clearly erroneous." (*Atchley* v. *City of Fresno* (1984) 151 Cal.App.3d 635, 648 [199 Cal.Rptr. 72].)

Further, although a court may properly rely upon extrinsic aids, it should first turn to the words of the ordinance to determine the intent of the legislative body. (See *Russ Bldg. Partnership* v. *City and County of San Francisco* (1988) 44 Cal.3d 839, 847 [244 Cal.Rptr. 682, 750 P.2d 324].) Narratives of discussions and events leading to adoption of a resolution are extrinsic materials that may properly be considered; however we must disregard a legislator's statement of opinion, understanding, or interpretation of the resolution at issue. (*Terminal Plaza Corp.* v. *City and County of San Francisco, supra*, 186 Cal.App.3d at p. 828.) "Nevertheless, the ultimate interpretation of the resolution is a question of law. We are bound neither by the interpretation of the lower court nor by the construction given the resolution by the City." (*Id.* at p. 826.)

▪ Turning to City Ordinance No. 149,131, we conclude that it does not constitute an unconditional acceptance of the dedication of the property; rather its unambiguous language contemplates that the property "may be acquired by the City of Los Angeles subject to the City assuming any obligation which may exist to remove railroad tracks and railroad facilities located within said real property." The ordinance thus authorized the mayor to execute an agreement and conveyance relieving Southern Pacific of the obligation to remove the tracks and restore street facilities and obligating City to undertake such removal and restoration. The foregoing language reasonably can only be interpreted as a qualified or conditional acceptance

of the dedication, which dedication could not be complete until the proposed contract and conveyance were executed. It is undisputed that no such contract relating to City's removal of tracks and restoration of property, as required by the ordinance, was ever executed by either Southern Pacific or the mayor; rather, negotiations between City and Southern Pacific continued sporadically over the years thereafter, with the parties eventually coming to a different agreement with respect to parcel 3.[2] Thus, City Ordinance No. 149,131 does not constitute or memorialize an acceptance of the dedicated property because acceptance was expressly subject to the execution of an agreement between City and Southern Pacific regarding certain matters, and there is no evidence in our record that the agreement as contemplated by the ordinance was ever executed. In the absence of the required executed contract, there could be no acceptance of the offer of dedication under the terms of the ordinance. (See also fn. 1, *ante.*)

The course of conduct thereafter of both City and Southern Pacific is also consistent with our interpretation of the ordinance as *not* constituting or memorializing an unconditional acceptance of the original donation deed with a park use restriction, because the parties continued to negotiate the terms of the dedication and acceptance *after* the ordinance was enacted. In February 1977, Southern Pacific sent a letter to Councilman Gibson stating that delivery of the original donation deed was conditioned upon Southern Pacific's receiving a certified copy of the City resolution accepting the donation deed and complete recording data with respect to the deed. It is

---

[2]We acknowledge that our record is not very clear about the nature of the contractual agreement between City and Southern Pacific about the status of parcel 3. Our record does not contain a copy of the subsequent quitclaim deed purportedly executed by Southern Pacific and submitted to City in January 1983. In September 1983, the city council adopted a motion agreeing to accept from Southern Pacific the southern portion of the property, including parcel 3, for general purposes; parcel 3 was thereafter assigned to the jurisdiction of the department of general services. If the dedication was accepted by City in 1983, we do not know what to make of a September 1993 letter by Southern Pacific in which Southern Pacific acknowledged that it had been working with Habitat to develop a portion of the property for affordable housing, and that it would "propose proceeding with donation of park property, with consideration thereto to the refund of taxes and assessments paid for the existing park site only, the removal of the open space overlay and the reservation of a pipeline easement." In any event, Southern Pacific has not appeared in the appeal in No. B121348, but has joined in City's brief in the CEQA appeal. We thus deem Southern Pacific to acquiesce in City's position now that City accepted the donation of the property without the park use restriction, and for "general purposes," in 1983. Moreover, City's reply brief in the land transfer appeal notes that "An agreement was just in the process of being finalized when this litigation was launched." It is unclear whether the agreement with Southern Pacific referred to in City's brief was ever "finalized." (See fn. 1, *ante.*)

For purposes of the instant appeal, we need not resolve the issue of when, if ever, City accepted dedication as to parcel 3. As long as City never accepted dedication of parcel 3 subject to any use restriction, any conveyance of City's interest in the property to Habitat for housing purposes would not be in violation of the public trust doctrine.

undisputed that the original donation deed was never recorded, and in fact, City returned the deed to Southern Pacific in November 1979. In the meantime, although the city attorney had prepared an agreement and conveyance as contemplated by the ordinance, Southern Pacific did not execute the agreement or conveyance. In a 1981 report of the city attorney to the Committee, the city attorney acknowledged that City had used the northern portion of the property as a park without first obtaining title and without checking the title, and that Southern Pacific had informed City in 1981 that if City was not willing to accept title to all four parcels, Southern Pacific was contemplating conveying its interest to others.

Thus, the subsequent conduct of both parties is consistent with the conclusion that the 1977 ordinance did not constitute an acceptance of the dedication with a park use restriction. Accordingly, the extrinsic evidence in our record, as well as City's own interpretation of the official actions in our record, are all consistent with the express language of City Ordinance No. 149,131 in indicating that the ordinance itself was not intended to constitute or memorialize an unconditional acceptance of the dedication of parcel 3, whether for park use or any other use. Thus, no park land use restriction attached to parcel 3 as a consequence of City Ordinance No. 149,131.

Inasmuch as City Ordinance No. 149,131 does not constitute or memorialize an acceptance of the 1976 donation deed with the park use restriction, and inasmuch as Baldwin fails to establish that acceptance of the property with a park use restriction occurred in some other manner, we conclude that the transfer and conveyance of parcel 3 to Habitat for affordable housing does not constitute an ultra vires act. Because the trial court's March 10, 1998, judgment granting Baldwin's petition for writ of mandate must be reversed, we need not address City and Habitat's other challenges to the petition based on Baldwin's alleged lack of standing as taxpayers and alleged improper splitting of causes of action by the failure to raise the land transfer issue in the first petition for writ of mandate challenging the mitigated negative declaration.

Because we are reversing the judgment in the land transfer appeal, we must now address the issues in Baldwin's appeal from the judgment of dismissal of their petition for writ of mandate, wherein the trial court concluded that City's revised negative mitigated declaration complied with CEQA.

## II

## CEQA Appeal (No. B114270)

Baldwin contends that City should have prepared an EIR for the housing project, rather than the MND, because complete elimination of two acres for public recreation conflicts with the property's established recreational use of the vacant lot by residents in the area for walking, bicycling and informal sports, and the project is inconsistent with the designation of the land as open space in the Wilmington-Harbor City Community Plan adopted in 1970. Baldwin's appeal thus raises only the issue of the impact of the project on recreational opportunities in the area.

"If the agency's initial study determines that 'there is substantial evidence that any aspect of the project, either individually or cumulatively, may cause a significant effect on the environment, regardless of whether the overall effect of the project is adverse or beneficial,' then the agency shall prepare an EIR. ([Cal. Code Regs., tit. 14, § 15063, subd. (b), or] Guidelines, § 15063, subd. (b).)" (*San Joaquin Raptor/Wildlife Rescue Center* v. *County of Stanislaus* (1996) 42 Cal.App.4th 608, 614-615 [49 Cal.Rptr.2d 494].) If there is no substantial evidence that the project or any of its aspects may cause a significant effect on the environment, then the agency shall prepare a negative declaration. (*Id.* at p. 615.) "In some instances the initial study identifies 'potentially significant effects' but determines that '[r]evisions in the project plans or proposals . . . would avoid the effects or mitigate the effects to a point where clearly no significant effects would occur.' (Guidelines, § 15070.) In this situation, when the negative declaration is circulated for review it must include these revisions, which are referred to in section 15071, subdivision (e) of the Guidelines as '[m]itigation measures, if any, included in the project to avoid potentially significant effects.' Appellant's use of the term 'mitigated negative declaration' or 'MND' appears to refer to just this situation, i.e., when there are revisions or 'mitigation measures' which are circulated for public review as part of the negative declaration. . . . The term 'mitigated negative declaration' does not appear, however, in any of the Guidelines which pertain to the negative declaration process. . . . A negative declaration by any other name is still a negative declaration." (*Id.* at p. 615, fn. 3.)

"A trial court therefore reviews an agency's decision to adopt a negative declaration using the 'fair argument' test. Under this test, the agency must prepare an EIR whenever substantial evidence in the record supports a fair argument that a proposed project may have a significant

effect on the environment. [Citations.] 'If such evidence is found, it cannot be overcome by substantial evidence to the contrary.' " (*Gentry* v. *City of Murrieta* (1995) 36 Cal.App.4th 1359, 1399-1400 [43 Cal.Rptr.2d 170].) " ' "Stated another way, the question is one of law, i.e., 'the sufficiency of the evidence to support a fair argument.' [Citation.] Under this standard, deference to the agency's determination is not appropriate and its decision not to require an EIR can be upheld only when there is no credible evidence to the contrary. . . ." Thus, the applicable standard of review appears to involve a question of law requiring a certain degree of independent review of the record, rather than the typical substantial evidence standard which usually results in great deference being given to the factual determinations of an agency.' " (*Pala Band of Mission Indians* v. *County of San Diego* (1998) 68 Cal.App.4th 556, 571 [80 Cal.Rptr.2d 294], italics omitted.) Thus, we conduct our review independent of the trial court's findings. (*Id.* at pp. 571-572.)

■■■ Public Resources Code section 21151, subdivision (b), "states that '[f]or purposes of this section, any significant effect on the environment shall be limited to substantial, or potentially substantial, adverse changes in physical conditions which exist within the area as defined in Section 21060.5.' Section 21060.5 defines 'environment.' It states: ' "Environment" means the physical conditions which exist within the area which will be affected by a proposed project, including land, air, water, minerals, flora, fauna, noise, objects of historic or aesthetic significance.' " (*San Joaquin Raptor/Wildlife Rescue Center* v. *County of Stanislaus*, *supra*, 42 Cal.App.4th at p. 616.) Thus, the agency is required to compare the newly authorized land use with the actually existing conditions; comparison of potential impacts with potential impacts under the existing general plan is insufficient. (*Gentry* v. *City of Murrieta*, *supra*, 36 Cal.App.4th 1359, 1415.) Although "CEQA nowhere calls for evaluation of the impacts of a proposed project on an existing general plan" (*Environmental Planning & Information Council* v. *County of El Dorado* (1982) 131 Cal.App.3d 350, 354 [182 Cal.Rptr. 317]), "[c]ertainly a project's impacts may be significant if they are greater than those deemed acceptable in a general plan." (*Gentry* v. *City of Murrieta*, *supra*, 36 Cal.App.4th at p. 1416, italics omitted.) On the other hand, we do not agree "that a project's effects cannot be significant as long as they are not greater than those deemed acceptable in a general plan." (*Ibid.*, italics omitted.)

" 'A project will normally have a significant effect on the environment if it will . . . [¶] [c]onflict with established recreational . . . uses of the area.' (Guidelines, appen. G, subd. (w).)" (*Gentry* v. *City of Murrieta*, *supra*, 36 Cal.App.4th 1359, 1417.)

■ Baldwin does not challenge any of the factual details set out in the revised MND, or the facts underlying the findings of the city council in approving the revised MND. The revised MND in this case addresses the issue of the project's provision for private and/or common open areas and recreational amenities, as well as the issue of the project's impact on the open space available for public recreation. The project required that a minimum of 100 square feet of usable open space be provided for each dwelling unit, excluding parking areas, driveways, and front yard setback areas.

With respect to project impacts on recreational opportunities in the area, the MND recited, consistent with City's findings, that the community plan currently designated 900 acres for open space uses, of which 278 acres were in active parks maintained by the department of recreation and parks; fiscal constraints and priorities within City indicated that within the foreseeable future City would not be in a financial position to develop and maintain the site as an active public park; the current public recreation element of City's general plan provided that a minimum of 10 percent of the total land area of the community plan area should be set aside for public recreation or open space use; the Wilmington-Harbor City Plan currently has 900 acres of land set aside as open space, for a total of 14.4 percent of the community plan's acreage; an additional 460 acres (7.4 percent of the acreage of the plan) is set aside as public/quasi-public land use, including public schools, libraries and government offices; the loss of 2 acres of the project site from the open-space land category constitutes a total reduction of 0.23 percent of the open space land in the plan area. Thus, the project would leave a total of 14.17 percent of the land in the community plan area set aside for open space, which is still above the 10 percent policy goal of the general plan.

While the MND acknowledged that the project site is sometimes used for walking, biking, and other informal, unorganized activities, there are about four acres of authorized City recreational facilities available in Greenbelt Park adjacent to the project site, there is a park and school a few blocks east of the project site, and the East Wilmington Pocket Park is a few blocks north of the project site. The greater Wilmington area also provided public recreational facilities in Harbor Regional Park, Banning Community Park, Banning High School, and other schools, and Wilmington Recreation Center. The MND further noted that "Because these recreational facilities are already available in the immediate neighborhood, no significant adverse impact upon recreational uses in the immediate neighborhood will result from development of the project site," and that "Any impacts upon recreational uses by the new residents of the project will be mitigated through the

Quimby fees to be paid by the project applicant which will be utilized to improve recreational facilities in the area."

Baldwin fails to cite to any evidence in the record, and we have found none, indicating that existing recreational opportunities in the immediate neighborhood of the project site are inadequate to accommodate the existing neighborhood or the future neighborhood with the new 26 homes to be built by Habitat. Our record thus fails to establish that the project will have a significant impact on the quality or quantity of these other existing recreational opportunities. Accordingly, we find no substantial evidence in the record supporting a fair argument that the project would have a significant effect on established recreational uses. The trial court properly dismissed Baldwin's petition for writ of mandate by its July 1, 1997, judgment.

## DISPOSITION

As to the appeal No. B114270, the judgment of July 1, 1997, is affirmed. As to the appeal No. B121348, the March 10, 1998, judgment is reversed and the cause is remanded to the superior court with directions to deny Baldwin's petition for writ of mandate. The parties are to bear their own costs on appeal.

Johnson, J., and Neal, J., concurred.